**W. J. EARHART, Appellant,**

v.

**Alfred J. CALLAN, Jr., Trustee in Bank-
ruptcy of the Estate of Felix Ivan
Pugh. Bankrupt, Appellee.**

**No. 14365.**

United States Court of Appeals,
Ninth Circuit.

March 10, 1955.

Rehearing Denied April 14, 1955.

John E. Belcher, Harold J. Shca, Seattle, Wash., for appellant.

Joseph A. Barreca, Seattle, Wash., Neal Clark, Kent, Wash., for appellee.

Before HEALY and POPE, Circuit Judges, and HAMLIN, District Judge.

HAMLIN, District Judge.

This is an appeal from the order of the United States District Court for the Western District of Washington, Northern Division, which ratified, approved and confirmed the order of the referee in bankruptcy in the Matter of Felix Ivan Pugh, Bankrupt, which order directed the trustee in bankruptcy in said bankruptcy estate to take possession of some 54 tons of alfalfa hay and administer the same as an asset of the bankrupt estate.

On October 14, 1953, Felix Ivan Pugh filed his petition in bankruptcy and upon the same day was adjudged a bankrupt. At said time there was upon the farm occupied by Pugh and in his possession 54 tons of alfalfa hay. W. J. Earhart, the appellant, claimed to own the hay. Alfred J. Callan, trustee in bankruptcy in the matter of Felix Ivan Pugh, a Bankrupt, petitioned for and obtained from the referee an order to show cause directed to Earhart to show cause why the referee should not make an order that said trustee in bankruptcy have full and complete title to the 54 tons of hay. W. J. Earhart made a return to the order to show cause, claiming full and complete title to the hay, and a hearing was had before the referee, at which Earhart was present and represented by counsel.

The facts developed at the hearing were as follows: Felix Ivan Pugh had operated a farm near Kent, Washington, and he needed alfalfa hay to feed his cattle in the fall and winter of 1953. W. J. Earhart was the agent for and related to the owner of the property. In the year 1952 Earhart financed Pugh for the purchase of hay, and in 1953 Pugh, expecting that Earhart would finance his purchase of hay again, went to Sunnyside, Washington, during the summer of 1953 and bought the hay in question from Mr. Harry C. Walters; the price of the hay was $1,200, and Pugh testified that at that time he gave Walters a check for $1,200 and that he received a bill of sale from Walters for the hay. Pugh testified that before he bought the hay, he contacted a man named Strother and hired him to haul the hay to Pugh's farm for $8 a ton.

Shortly thereafter Pugh saw Earhart, told him that he had bought the hay, and asked Earhart for the money to cover the check that Pugh had given Walters. Earhart testified that he told Pugh that he should not have bought the hay, and that he, Earhart, was going to handle it differently. Earhart then wrote to a bank, sending $1,200 to the bank, and asked that the bank handle the matter of the payment for the hay. The bank, however, declined to do this, and Earhart then wrote to Walters, sending to Walters the sum of $1,200. In the meantime, Walters had sent Pugh's check to the bank and it had been returned to Walters marked "N.S.F." Walters accepted the check from Earhart and destroyed the check which he had previously received from Pugh. Pugh testified that he gave to Earhart the bill of sale that he had received from Walters. The hay was delivered to Pugh's farm in four loads. Pugh or his wife paid the hauling charges for delivering one load, they being later reimbursed for this by Earhart; and Earhart paid for delivery of the other loads.

Pugh testified that he talked to Earhart in July of 1953 and they then discussed the matter of the hay for the '53-'54 season. Pugh testified "The way I interpreted it, anyway, the deal would be like the year before,—that he would finance me on the hay." Question: "Didn't he say there would have to be a different way the hay was financed?" Answer: "The year before, the hay was

just on a note, and he wanted $200 a month when I started feeding the hay, and the year before we figured it at $100 a month—when I started to feed the hay, I was to pay him $200 a month until the money was paid out plus interest." After the hay was received by Pugh, it was at all times kept in the barn upon Pugh's property and at the time of the bankruptcy had not yet been used.

A couple of days after Pugh filed his schedules in bankruptcy Earhart, having learned of this, went to see Pugh; and at Earhart's insistence, Pugh signed a statement which read: "I wish it to be known that the 54 tons of alfalfa hay * * * was bought and paid for by W. J. Earhart, is fully his property and I have no claim against it." Pugh testified that Earhart told him at that time that he (Earhart) would not leave until Pugh signed this statement and that Earhart shook his finger at him and said, "Either sign this, or * * *" Pugh further testified that when he signed the statement, he "didn't care who had title to it", and when asked at the hearing if he then cared very much, he answered, "No, that is very true." And when asked, "And you felt no harm could be done, is that the reason you signed it?" Pugh answered, "Yes, sir." Pugh further testified before the referee that when he bought the hay he intended it to be his hay, and that he thought Earhart was financing him.

On the contrary, Earhart testified that when Pugh told him that he, Pugh, had bought the hay, that Earhart said to him, "You should not have bought the hay. I am going to handle it differently. I am buying that hay." Earhart further testified that he then wrote to the bank, stating—

"I told Ivan Pugh that I would see he could lay in his alfalfa hay for the winter, and consequently when he was over at Sunnyside he bought 60 tons of hay at $20, trucking extra. He wrote a check for $1200, thinking I would cover it as soon as he got here.

"I do not intend to handle it that way. I will buy the hay and store it at the farm, and will sell it to Ivan as he uses it by the month.

"Here is my check for $1200. Will you please handle it so that I will be the owner of the hay and I will pay you for the trouble you are put to."

The bank returned the check of $1200 to Earhart, stating:

"We suggest that you make direct payment to the people from whom you purchased the alfalfa hay and get a bill of sale.

"We have no way of protecting your interest in this matter."

Thereafter, Earhart sent the $1,200 direct to Walters as indicated above.

At no time did Earhart receive from Walters a bill of sale for the hay.

The bankrupt did not list the hay as an asset in his bankruptcy schedule, but did list in his schedules as a debt the amount that Earhart had paid to Walters for the hay and the amount that Earhart had expended for hauling costs.

The referee in bankruptcy made the following findings of fact, among others: (1) That the bankrupt purchased the hay from Walters and paid for it by tendering a check for $1,200 to Walters; (2) That it was the intent of both parties that title should pass to Pugh; (3) That prior to said purchase Earhart and Pugh both agreed that Earhart would finance the transaction; (4) That later Earhart disapproved of the transaction and sent his check to Walters; and (5) That Walters accepted Earhart's check in payment for Pugh's debt on the hay.

The referee made the following conclusions of law: (1) That at the time of the filing of the petition in bankruptcy Pugh had full title and full possession of the hay; (2) That the oral agreement between Walters, Pugh, and Earhart as to the payment of the debt due on the unpaid check by Pugh constituted a novation, and that Pugh was to pay Earhart on an installment basis the full amount advanced by Earhart to Walters; (3)

That the arrangement between Earhart and Pugh constituted an oral security transaction, and said security transaction was not filed or recorded with the auditor of King County, Washington, as required by law; and (4) That the trustee was vested with all rights of the bankrupt in and to said hay; and ordered further that any lien of Earhart in and to the hay was null and void as to the trustee in bankruptcy.

The District Court in affirming the order of the referee, after hearing both sides on the petition for review of the referee's order, made an order in which the following appeared:

"It appearing to the Court that the findings of fact are supported by the full record and transcript of proceedings and testimony, and that the conclusions of law are not shown to be in any way erroneous, now therefore it is ordered * * * that the order heretofore entered by the * * * Referee in Bankruptcy is in all respects ratified, approved, and confirmed * * *."

and ordered:

" * * * that petitioners have no right, title or interest in said hay * * *."

Earhart contended in the District Court and in this Court, First, that he was the owner of the hay in question and that Pugh had no interest therein; and Second, that the evidence as a whole shows a bailment of the hay and that Earhart orally agreed with the bankrupt that he would sell the hay to him on a monthly basis.

The record shows that conflicting evidence was presented to the referee on the question of Pugh's interest in the hay. There is substantial evidence to support the finding of the referee that Pugh pur- chased the hay from Walters with the intent to take title to the hay.

A bailment is generally regarded as the relationship arising when personal property is delivered to another for some particular purpose upon an express or implied contract to re-deliver the goods when the purpose had been fulfilled or to otherwise deal with the goods according to the bailor's directions. 8 C.J.S., Bailments, §§ 1, 3, pages 222, 229; Collier on Bankruptcy, 14th ed. by Moore and Oglebay, § 60.44, p. 948, § 70.18, p. 1045. It is an indelible incident to a bailment that the bailor may require restoration of the thing bailed. Here, even under Earhart's theory, Pugh had the right to feed the hay to his cattle and to pay Earhart therefor upon a monthly basis.

On the other hand, the distinguishing feature of a conditional sale is an obligation to buy and to pay the agreed price. Collier on Bankruptcy, supra, §§ 60.43, 70.19, 70.57. Kemp-Booth Co. v. Calvin, 9 Cir., 1936, 84 F.2d 377. The Washington decisions adhere to this distinction when called upon to classify the transaction either as a conditional sale or as something else. Eisenberg v. Nichols, 22 Wash. 70, 60 P. 124; Eilers Music House v. Fairbanks, 80 Wash. 379, 141 P. 885; Inland Finance Co. v. Inland Motor Car Co., 125 Wash. 301, 216 P. 14; Ivy v. Commercial Credit Co., 173 Wash. 360, 23 P.2d 19; In re Renfro-Wadenstein, D.C.Wash., 47 F.2d 238, modified, 9 Cir., 53 F.2d 834; and see 175 A.L.R. 1366, 1382.

However, a finding of a conditional sale or a chattel mortgage can not help appellant. It is an undisputed fact that no instrument pertaining to the transaction in question was recorded, as is required by Washington statutes for the protection of the creditor's lien.[1] Nor

---

1. *"Conditional sales* of personal property, or leases thereof containing a conditional right to purchase, when the property is placed in the possession of the vendee, *shall be absolute as to all bona fide* purchasers, pledgees, mortgagees, en- cumbrancers, and *subsequent creditors,* whether or not such creditors have or claim a lien upon the property, *unless within ten days after the taking possession by the vendee, a memorandum of the sale,* stating its terms and conditions,

is it disputed that if the transaction be a conditional sale, or a chattel mortgage, the interest of the vendor, or creditor, is void as to subsequent creditors, and hence as to the trustee in bankruptcy. Collier on Bankruptcy, supra, §§ 70.49, 70.57.

The testimony before the referee produced substantial evidence to support a finding that Pugh had obligated himself to pay for the hay. Certainly there was no evidence to support a finding that Pugh took the hay upon any kind of a contract to deal with it according to Earhart's directions or to redeliver it to him. Rather, the evidence showed that Pugh was to have sole control over the disposition of the hay, and promised to pay $200 a month on the purchase price.

■■ The scope of review which the District Court and this court affords to orders of a referee in bankruptcy is governed by the General Orders in Bankruptcy. Orders 47, 36, 37, 11 U.S.C.A. following section 53. These Orders, as implemented by Rules 52(a) and 53(e) of the Federal Rules of Civil Procedure, 28 U.S.C.A., require the District Court to accept the referee's findings unless clearly erroneous. Humphrey v. Hart, 9 Cir., 1946, 157 F.2d 844; In re Skrentny, 7 Cir., 1952, 199 F.2d 488, 492. Similarly, this court may not set aside the findings of the referee unless they are clearly erroneous. Diamond Laundry Corp. v. California Employment Stabilization Comm., 9 Cir., 1947, 162 F.2d 399, 401; Smith v. Federal Land Bank of Berkeley, 9 Cir., 1945, 150 F.2d 318, certiorari denied 326 U.S. 764, 66 S.Ct. 145, 90 L.Ed. 460; Link v. Boeshans, 8 Cir., 1945, 151 F.2d 322.

■ The findings of the referee here are not clearly erroneous and must be sustained. These findings and the evidence as a whole cannot serve as the basis for a holding that the transaction was a bailment. They amply support the conclusion that Earhart's interest in the hay was, at most, a lien pursuant to a conditional sale or a chattel mortgage. It follows that the order below must be upheld.

Appellant makes some contention that even where the District Court hears an appeal from an order of a referee, he is required by Rule 52(a) of the Federal Rules of Civil Procedure to make independent findings of fact, without reference to those of the referee. While some findings must be found by the District Court, this court has said in reviewing a District Court's approval of the report of a referee in bankruptcy:

"The record on appeal showed that the court below had not found the facts, as of course it should have done, *either by adopting the master's findings or by making findings of its own.*" Humphrey v. Hart, supra, 157 F.2d at pages 845–846; (emphasis supplied).

■ The applicable rules and decisions clearly do not require the District Court to enter its own findings of fact if the findings of the referee are adopted or approved by the lower court. Therefore, appellant's contention in this regard is without merit.

■ Appellant has questioned the jurisdiction of the referee in bankruptcy to adjudicate the conflicting claims of the trustee and the appellant as to the owner-

---

including the rate of interest and the purchase price exclusive of interest, insurance, and all other charges, and signed by the vendor and vendee, *is filed in the auditor's office of the county, wherein,* at the date of the vendee's taking possession of the property, *the vendee resides * * *.*" Rev.Code Wash. 63.12.-010; (emphasis supplied.)

"A chattel mortgage is void as against *all* existing and subsequent *creditors* of the mortgagor, whether or not they have or claim a lien upon the property, and

against all subsequent purchasers, pledgees, and mortgagees, and encumbrancers for value and in good faith, *unless it is accompanied by the affidavit of the mortgagor* that it is made in good faith, and without design to hinder, delay, or defraud creditors, *and unless it is acknowledged and filed, within ten days* from the time of its execution, *in the office of the auditor* of the county in which the mortgaged property is situated * * *." Rev.Code Wash. 61.04.020; (emphasis supplied.)

ship of this hay in a summary proceeding. It is well settled that the referee has such jurisdiction where the subject of the controversy is in the possession of the bankrupt at the time when the petition in bankruptcy is filed. Magnolia Petroleum Co. v. Thompson, 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876; Harris v. Avery Brundage Co., 305 U.S. 160, 59 S.Ct. 131, 83 L.Ed. 100; Heath v. Helmick, 9 Cir., 1949, 173 F.2d 157; and see England v. Nyhan, 9 Cir., 1944, 141 F.2d 311.

We find no reason to disturb the order of the referee as approved by the court below, and the order of the District Court is hereby affirmed.