**Billy F. PRICE, Henriette Hoffman Von Schirach, and Heinrich Hoffman, Jr., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. H–83–4969.**

United States District Court, S.D. Texas, Houston Division.

Feb. 9, 1989.

Larry A. Campagna, Chamberlain, Hrdlicka, White, Johnson & Williams, Houston, Tex., for plaintiffs.

Frank Conforti, Asst. U.S. Atty., Houston, Tex., for defendant.

## OPINION ON PARTIAL SUMMARY JUDGMENT

HUGHES, District Judge.

In this suit against the United States, an art investor and the children of a German

photographer and curator seek recovery of four paintings and two photographic archives seized in Germany by the United States Army in May 1945. As an alternative, the plaintiffs seek money damages for the conversion of the property.

Cross motions for summary judgment have been filed. Judgment will be entered for the plaintiffs for title and possession.

*The Paintings.*

The four watercolors were painted by Adolph Hitler. Hoffman acquired them from Hitler by gift in 1936. They were found in a German castle where Heinrich Hoffman, Sr., had stored them for safe keeping during the war. In May 1945, as American troops moved through Germany, the paintings were discovered and taken to the United States Army's central collection point in Munich so that they, like other art, could be returned to the owner. No claim for the paintings was ever made, but the United States surmised that they somehow belonged to Germany. The paintings were transferred to the United States in 1950 and have been stored in an army warehouse in Virginia where they are identified by the United States as works by Hitler and "property of the state of Germany."

Heinrich Hoffman, Sr., died in 1957. At the war's end, having been adjudged a war profiteer at a Nurenberg trial, he had been dispossessed of eighty percent of his property as punishment. The Hitler paintings were not among the possessions he lost; therefore, title to the paintings passed to his children Heinrich Hoffman, Jr., and Henriette Hoffman von Schirach. When Hoffman was released from jail in 1950, according to his children, he knew the United States Army had taken the watercolors, but none of the Hoffmans had knowledge of their location until 1982, when Billy F. Price showed them an army brochure which depicted the watercolors. Von Schirach identified them as the four paintings owned by her father that disappeared in 1945.

Von Schirach agreed to convey ownership of the works to Price in exchange for his securing them from the possession of the United States. The plaintiffs, Price,

von Schirach, and Hoffman, Jr., began making written requests for their return in mid–1982. By letters dated January 5, 1983, and May 4, 1983, the United States Army refused to surrender possession of the paintings. After Federal Tort Act claims were denied, this suit was filed in August 1983.

*The Photographs.*

In addition to the four watercolors, this suit involves a demand for the return of two photographic archives. The first archive is held by the General Services Administration in Washington, D.C. It was compiled during the early 1900s when Hoffman ran a press photograph agency. In 1937, Hoffman transferred ownership to his son. Young Hoffman supplemented this photograph collection from 1937 to 1945. Unlike his father, young Hoffman has never been adjudicated a war criminal.

The Hoffmans learned that the archive was held by the United States Army in late 1945 when they were summoned to identify photographs to be used at the Nurenberg trials. Young Hoffman was compensated for cataloging the collection. While working on the collection between 1946 and 1949, Hoffman was told on many occasions that it would be returned to him when the Army's use was concluded. In an affidavit, Hoffman states that General Potter was among the United States officials who assured him the archive would be returned.

In 1951, General Potter told the plaintiff that the Army had decided to ship the archive to the United States for use in compiling a history of World War II. In the mid–1950s, Hoffman, was told by a German lawyer, whom he had hired to inquire about the archive's return, that the Army would keep it for as long as it was needed. Hoffman visited the United States in 1971 and viewed what was labeled as the Heinrich Hoffman collection in the National Archives in Washington, D.C. Again, Hoffman sought the advice of a lawyer about reclaiming it, and he was told that as long as it was held with the understanding that it belonged to him, a statute of limitations would not run. The Hoffmans' ownership in the archive was also conveyed to

Price, and the plaintiffs made their first demand for the return of the Washington archive in June 1983. In a letter dated September 13, 1983, the General Services Administration refused to relinquish the archive. The plaintiffs filed Federal Tort Act administrative claims for its return; they were denied.

The second photographic archive is located at a Pennsylvania Army base. It was looted by *Time* magazine correspondents in 1945 from a German castle. Most of the collection originally taken by *Time* was returned to the Hoffmans in the settlement of an unrelated suit. Through discovery in the lawsuit against *Time*, the plaintiffs found that the magazine had delivered some of the photographs to the United States Army in Carlisle Barracks, Pennsylvania. In May 1984, the United States denied the plaintiffs' third tort claim for conversion of this archive.

*Claims.*

The government claims that treaties limiting actions arising from activities in World War II, sovereign immunity, the Tucker Act, and a statute of limitations shield it from liability for the return of all the Hoffman works. The parties do not dispute the circumstances of the seizure of the paintings and archives, the identity of the owners in 1945, or the dates that demand for their return was made.

On October 20, 1986, the parties were ordered to make a list of operative facts, yet the government claims that a protective order granted in 1984 prevents it from having to answer the plaintiffs' requests for admissions. In the five years that this suit has pended, the government has not controverted any of the plaintiffs' summary judgment evidence, except to call it self-serving. The United States has offered no letters to show that it refused to redeliver before 1982 or challenged the authenticity of the plaintiffs' documents about their 1982 demands and the refusals.

*Summary Judgment.*

■ The party seeking a summary judgment must establish that (1) no genuine dispute exists about any material fact, and (2) the law entitles it to judgment. Fed.R.

Civ.P. 56(c); *Thomas v. Harris County,* 784 F.2d 648, 651 (5th Cir.1986). Until the movant has properly supported the motion, no response is required. Once this is done, however, to preclude the rendition of a summary judgment, the nonmovant must present evidence demonstrating specific, contested facts that are material to the issues requiring adjudication. Fed.R.Civ.P. 56(e). For this purpose mere allegations or denials will not be sufficient. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Fontenot v. Upjohn Co.,* 780 F.2d 1190 (5th Cir.1986).

*Immunity.*

The United States urges that this case be dismissed because under the Settlement Convention, signed by the United States and Germany at the Yalta Conference, Germany waived the claims of its nationals arising out of the war against the United States. Article 1, Chapter Nine, of the Settlement Convention provides: "German nationals ... shall not assert against countries ... claims of any description arising out of actions taken or authorized by the governments of these countries between September 1, 1939, and June 5, 1945, because of the existence of a state of war in Europe." 6 U.S.T. 4411, T.I.A.S. No. 3425 (1954). Article 3 of the Convention extends the provisions of Article 1 through the date of the treaty, October 23, 1954.

The parties do not dispute that Germany was empowered to waive the claims of its nationals, but the claimants urge that this suit arose not out of the war but from unlawful action by the United States in the United States after 1945.

*Bailment.*

■ The representations of the United States Army from 1945 until 1982 indicate that a bailment for the benefit of the United States existed between it and the Hoffmans. Title was in the Hoffmans, and possession for a limited purpose was in the United States. Although the bailment arose out of wartime activity, it did not ripen into a claim until the duty to redeliver was breached by the United States's asser-

tion of ownership in the paintings and archives. Both the refusal to redeliver and the assertion of title occurred in the United States almost forty years after the war. The bailor's right to require restoration of the item bailed is an indelible incident to a bailment. *Earhart v. Callan,* 221 F.2d 160 (9th Cir.1955), *cert. denied,* 350 U.S. 829, 76 S.Ct. 59, 100 L.Ed. 740 (1955). Had the paintings and archives been pillaged in 1945 with no manifestation of an intent to return them, the defendant's immunity defense would be sustained. The Hoffmans, living in an occupied state, may have had no practical choice but to consent to the United States's requisition of the archives. This does not negate the existence of a bailment, the terms of which were not breached until well after 1954 when the defendant's use concluded and return was refused.

■ Similarly, it was not the intent of the United States to convert the paintings in 1945; the government's repeated representations that the paintings were being held for the owners created a bailment for the benefit of the Hoffmans. The labels the United States used in displaying the property belie any claim of ownership before this suit. Mutual express assent is not necessary to create a bailment; implication is enough. Indeed, many bailments, like the traditional lost property cases, arise by operation of law. Brown, *Personal Property,* 3d ed., § 10.1, p. 210. In the absence of an express agreement by the bailee to return the bailed property to the bailor, the law implies that he will do so. *Loya v. Bowen,* 215 S.W. 474 (Tex.Civ.App. —El Paso 1919, no writ).

*Ozanic,* a case in which an international treaty barred a wartime claim against the United States, is distinguishable from this dispute. *Ozanic v. United States,* 188 F.2d 228 (2d Cir.1951). The foreign plaintiffs' claim arose from a maritime collision in 1942. The United States's lend-lease settlement agreement with the Allies released claims arising out of collisions at sea between 1941 and 1946. Ozanic's claim arose and was actionable in 1942 when the ships collided; thus the settlement agreement conferred immunity.

Without controverting the legal significance of the facts, the government claims that the hearsay by which a bailment is shown would not be admissible at trial and should not be weighed as summary judgment evidence. The government has offered no proof of its intention to steal the art in 1945; that would have controverted the nonthreatening statements by its officers to the Hoffmans. The statements of General Potter and officers of the United States Army would, however, be admitted under the hearsay exception for statements against interest. The government's only other attempt to controvert the plaintiffs' affidavits has been to call them self-serving. To resist a motion for summary judgment, the defendant must show that the plaintiff has made material misstatements or offer and support a plausible, alternative version of what transpired. If, for instance, the government had letters dated before 1982 showing that an adverse possession had arise then, the plaintiffs might be defeated.

■ The government received the second archive in 1981 and 1983 from *Time.* Clearly, the 1954 treaty does not apply to this archive since it was not taken by the government in 1945, nor under the authority of the United States before October 1954. The title of the United States cannot rise above its source, which is *Time,* in this decade, in America.

*Nazi Icons.*

The United States claims that the paintings are a Nazi influence which according to the Yalta agreement they were empowered to confiscate. The United States' own actions in 1945 contradict this assertion; the paintings, along with other objects, were taken to the Munich collection point to be returned to the owners.

■ Also, the characterization of the paintings as war art is inconsistent with the United States Army's description of the watercolors in a brochure as "innocuous, pleasant scenes." That four architectural paintings which visually are noteworthy

only for their precise rendition of 18th Century structures could be "rallying points for a possible revival of Nazism" is incredulous. The government relies on a congressional reference to the paintings as "war art." Pub.L. No. 97–155, 96 Stat. 14 (1982). It appears that the paintings are called war art because they were done by the Nazi leader and not because they convey a propagandistic message which the United States Army was, in 1945, authorized to combat.

 Even if the paintings are Nazi relics, they were never removed from Germany for the purpose of deNazification, which may have been permissible under the Treaty and the Constitution of the Federal Republic of Germany (1949), Art. 5 and 18. A claim by the United States that it is presently effectuating deNazification by property seizures in the United States, however, implicates the First and Fifth Amendments. The photographs document historic events which are commonly depicted in the news media. This is a simple dispute over the right to some personal property. The artist, the war, and the state's prerogatives are simply not legally relevant.

*Jurisdiction.*

 The United States maintains that the F.T.C.A. foreign country exception is a jurisdictional bar to the plaintiffs' suit. 28 U.S.C. § 2680(k). Section 2680(k) withdraws the district court's jurisdiction in claims where the United States is a defendant for "any claim arising in a foreign country." The foreign acts exception does not apply if the wrongful acts or omissions occurred in the United States. *Sami v. United States,* 617 F.2d 755 (D.C.Cir.1979). The purpose of § 2680(k) was to avoid the risk of United States exposure to unreasonable liability under foreign law and facts over which this country has no control. The acts sued on, the denial of the Hoffmans' demand for the return of their property, occurred in the United States and liability is determined under United States law.

In another case, a soldier named Morrison found $100,000 in a cave in Vietnam, and after he turned the money over to the military, his commander told him that he had no claim to it. He then sued for the return of the money. The federal court did not have jurisdiction under the Tort Claims Act. Had Morrison's commander told him, "The money is yours and will be placed in a vault for safekeeping," and had a demand and refusal been made in the United States, that case would be analogous to this litigation. Morrison's claim, however, arose in Vietnam where his ownership of the money was directly challenged. *Morrison v. United States,* 316 F.Supp. 78 (M.D. Ga.1970).

 The government's reliance on § 2680(j), which exempts claims "arising out of the combatant activities of the military," is misplaced for the same reason; the plaintiff does not challenge any actions taken by the United States military in 1945. Stealing art in 1982 is not the same as blowing it up in 1945. This exception could not apply to the archive seized by *Time.*

The Section 2680(c) exemption of jurisdiction for "detention of goods by customs or law enforcement officers" is inapplicable because neither the Army officials nor the G.S.A. employees are law enforcement or customs officials. The discretionary acts exception of § 2680(a) does not assist the government. The government apparently acted responsibly in 1945, but now it tries to defend its post-war error by claiming that it was deNazifying Germany or other appeals to negative patriotism. An agent's exercise of decision-making power does not cloak the government with immunity. *Smith v. United States,* 375 F.2d 243, 246 (5th Cir.1967).

*Statute of Limitations.*

 The record establishes that a bailment between the United States and the Hoffmans existed for the paintings and the first archive from May 1945 until the contracts were breached by the bailee's refusal to return them in 1983 and 1984. No claim arose until the Hoffmans demanded and were refused redelivery. "No right of action, however, accrues in any case against

the bailee, unless there has been some wrongful conversion or some loss by gross negligence on his part, until after a demand made upon him, and a refusal by him, to redeliver the deposit." J. Story, *Law of Bailments,* 110 (8th Ed.1870). Contractual and tort claims against the United States are actionable under 28 U.S.C. 1346(a)(2), and (b). The governing statute of limitations is in 28 U.S.C. § 2401. A tort claim is barred "unless presented in writing to the appropriate federal agency within two years after the claim accrues" and a contract claim is barred "within six years after the right of action first accrues." Because this suit was filed within two years of the rejection of the plaintiffs' demands, it falls within the statute of limitations. The United States has not shown the claim accrued before 1983.

 The known facts directly contradict the government's allegation that possession of the paintings was adverse since 1945. The government's identification of the paintings as "probably belonging to Germany," contradict their claims of adverse possession. To establish title to chattels by adverse possession, the possession must be hostile, actual, visible, exclusive, and continuous. The government's representation that it was keeping the first archive for as long as needed and its labeling the archive the Heinrich Hoffman collection are inconsistent with claims of hostility. Hoffman's 1972 inquiry about the archive shows he had not abandoned it. The party claiming adverse possession has the burden of demonstrating it, rather than asserting merely the weakness of another's possession. *Houston v. U.S. Gypsum Co.,* 569 F.2d 880, 886 (5th Cir.1978). The second archive could not have been held adversely to the plaintiffs since its continued existence was not discovered until 1984; the government did not acquire it until 1982.

 A bailment continues until the bailor has notice of an unmistakable act by the bailee in derogation of his underlying title. Possession in one person and title in another is the essence of a bailment. In a recent case, the son of the Czech artist Alphonse Mucha recovered in 1986 a painting by his father based on a bailment that arose in 1920 when the painting was consigned to an art gallery. *Mucha v. King,* 792 F.2d 602 (7th Cir.1986). To determine when the statute of limitations tolled, Judge Posner traced the history of a 59–year bailment to show that the artist and his heirs had not had their title attacked until 1979. Mucha had asked the gallery to ship his works to Europe in 1929, but the paintings remained in storage at the gallery at Mucha's death in 1938. This was not a conversion; it was a failure to follow instructions that was not tantamount to an assertion of an interest in the paintings inconsistent with Mucha's rights. The artist never complained about the failure; his assent to the gallery's continued possession extended the bailment.

In an attempt to show that the statute of limitations had elapsed, King introduced letters by Mucha's son in 1958 addressed to the gallery, inquiring "what is the position of my father's paintings." This letter is analogous to Hoffman's 1954 and 1972 inquiries about the first archive; neither revoked the bailment. Replying to Mucha's 1958 letter, the gallery owner wrote, "I feel that 'The Kiss' should belong to us to cover storage charges." The court construed this as a suggestion rather than a repudiation of the bailment; it could not be an abandonment of the claim by the heirs. Also, a 1929 proposal by the gallery to keep the painting did not modify the consignment because it was not accepted and no fresh consideration was offered. *Id.* at 607.

 Even if the conversion by the government were earlier than 1981, the statute of limitations does not begin to run until the bailor discovers or, in some states, should have discovered that the bailee converted bailed property. The F.T.C.A. limitations period does not mention discovery. Jurisdictions with the discovery rule do not apply that rule if problems of proof created by the passage of time outweigh the hardship to a plaintiff who could not, as a practical matter, have sued any earlier than he did. The Hoffmans lacked the means to

pursue the title to their property until they had obtained the support to defend their claim, until they were joined by Price in 1982. They may not be penalized for not provoking the United States into a dispute until they were prepared to resist the resulting conversion.

*The Tucker Act.*

■ 28 U.S.C. § 1346(a)(2) confers jurisdiction to district courts for claims against the United States, not exceeding $10,000, founded on any express or implied contract. The plaintiffs, having shown the existence of a bailment by operation of law and having sued within the statutory period, may assert a claim in district court irrespective of the Tucker Act's limitations. If the bailment were held to have arisen from a contract between the parties, the limitation on monetary recovery need not be reached because the property can be redelivered to the plaintiffs. The only damages left that could be limited is the value of the loss of use of the property between the conversion and judgment for title and possession, which might be below $10,000.

*Conclusion.*

After five years of litigation, the United States has been unable to contest factually the title of the Hoffmans or the nature of the government's acquisition of their property. Instead of property law arguments, the government relies on political denigrations of the artist and the archivist. Equal justice under law protects people without exceptions for those people whose father's politics were wrong.

The motion of the United States to dismiss will be denied, and a summary judgment will be granted for the plaintiffs for title and possession. A hearing will be set on damages and on the mechanics of restoration of possession.