United States Court of Appeals,

Fifth Circuit.

No. 93-2564.

Billy F. PRICE, et al., Plaintiffs-Appellees Cross-Appellants,

v.

UNITED STATES of America, Defendant-Appellant Cross-Appellee.

In re the Petition of Billy F. PRICE and Henriette von Schirach, geb. Hoffman to Perpetuate the Testimony of Henriette von Schirach, geb. Hoffman, et al.

UNITED STATES of America, Appellant-Cross-Appellee,

v.

Billy F. PRICE, et al., Appellees-Cross-Appellants.

Nov. 20, 1995.

Appeals from the United States District Court for the Southern District of Texas.

Before WOOD, JR.[*], JOLLY and DeMOSS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal requires us to decide whether a federal court can award damages against the United States in connection with its refusal to turn over pieces of art and historical photographs that were removed from Germany during the allied occupation after World War II. Billy Price, a Texas businessman, obtained a nearly $8 million judgment against the United States after it refused his demands for four watercolor paintings that were painted by Adolf Hitler and photographic archives that were compiled by Hitler's personal photographer, Heinrich Hoffman, and Hoffman's son. In the

_____

[*]Circuit Judge of the Seventh Circuit, sitting by designation.

1

early 1980s—almost four decades after these paintings and archives were discovered in various locations in Germany and shipped to the United States—Price, who is described on the jacket of his self-published book as the "owner of one of the largest collections of Hitler art and an internationally acknowledged expert on the subject," purchased the rights in the paintings and archives from Hoffman's heirs. Price then demanded that the United States deliver them to him and, after the United States refused, he filed this suit alleging that the refusal constituted a tortious act of conversion.

The United States argues broadly on appeal that the judgment of the district court cannot be sustained. We agree. For the reasons that follow, we hold that the district court was without subject matter jurisdiction over the case. Accordingly, we reverse the judgment of the district court and remand with instructions to dismiss.

I

Putting to one side the historical, military, and foreign policy aspects of the case, this lawsuit is simply a claim for damages resulting from the tortious conversion of chattels. The claim is made against the United States, however, and the chattels consist of items taken from Germany during the post-World War II occupation: specifically, four watercolor paintings by Adolf Hitler and photographic archives that were compiled by Heinrich Hoffman and his son, Heinrich Hoffman, Jr.

Hoffman obtained the watercolors by purchase and by gift from

Hitler.  One pair, titled "Old Vienna Ratzenstadl" and "Munich 1914 Alterhof," depict urban landscapes and were painted when Hitler lived in those cities before he entered the German army in World War I.  The other pair, titled "On the Railroad Line of Biache" and "Beclaire 1917," were painted during World War I and depict a railway embankment and a war-devastated village, respectively.[1]

The photographic archives that were compiled by the Hoffmans consist of several hundred thousand prints and glass-plate negatives that depict images of political, historical, and cultural significance in Europe from the 1860s through the rise and fall of Hitler's regime.  The archives are in two parts.  The larger of the two parts has been in the possession of the United States since it was found in Germany by the United States Army.  It is stored at the National Archives in Washington, D.C., and thus will be referred to as the "Washington archive."  The smaller of the two parts came into the possession of the United States in the early 1980s, when Time-Life Inc. gave it to the U.S. Military History Institute in Carlisle, Pennsylvania—hence, we will refer to it as the "Carlisle archive."  Employees of Time had removed it from Germany in the 1940s.

Price's involvement began in the early 1980s when, while visiting Germany to research a book on Hitler's career as an artist, he learned that Hoffman had been the owner of the four

_____

[1]Copies of the watercolors are attached as exhibits.  *See* Appendix.

watercolors.[2] He paid a small sum to the heirs of Hoffman, who are citizens and residents of Germany, in exchange for their rights in the watercolors and archives. He also promised to seek their return and to give Hoffman's heirs a portion of whatever he might obtain from the United States. He then made demand upon the United States for the return of the watercolors and archives and filed his first complaint in this lawsuit on August 9, 1983.

In February 1989, the district court denied a motion by the United States to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure and entered a partial summary judgment on the issue of liability in Price's favor. *Price v. U.S.,* 707 F.Supp. 1465 (S.D.Tex.1989). The district court appears to have determined that the United States became a bailee when it took possession of the watercolors and photographic archives in Germany, and that the bailment continued until it was breached in the United States in the early 1980s when the United States refused Price's demands. Observing that "[i]n the five years that this suit has pended, the government has not controverted any of the plaintiffs' summary judgment evidence, except to call it self-serving," *id.* at 1469, the district court chastised the United States for its defense strategy. "Instead of property law arguments, the government relies on political denigration of the artist and the archivist. Equal justice under

---

[2]In 1983 and 1984, Price published German and English language editions of a catalog of Hitler's paintings and sketches. The catalog depicts the paintings that are the subject of this case. *See* Billy F. Price, *Adolf Hitler: The Unknown Artist* (English ed. 1984).

4

law protects people without exceptions for those people whose father's politics were wrong." *Id.* at 1473. "After five years of litigation," the opinion concluded, "the United States has been unable to contest factually the title of the Hoffmans or the nature of the government's acquisition of their property." *Id.* The district court found that Price held title to the watercolors and archives and was entitled to possession.

Although the United States did not introduce any evidence to create a factual dispute while the case was pending, after the partial summary judgment was entered, the United States came forward in short order with additional jurisdictional and other defenses, as well as evidence to support its arguments, and urged the district court to reconsider its decision. The district court refused and instead proceeded to a trial on damages. The court determined that damages from the United States' conversion of the watercolors and archives, including the loss of use from 1983, the time of conversion, amounted to $7,949,907.69, and entered judgment accordingly. Both sides appeal, the United States contending for numerous reasons that the judgment cannot stand, and Price[3] contending that the judgment awarded is insufficient because he is entitled to $41 million in damages.

## II

At its foundation, this case presents questions that implicate the sovereign immunity of the United States. We are

_____

[3]"Price" refers also to the heirs of Hoffman, who joined the suit as plaintiffs. The district court dismissed their claims as moot in the light of its decision.

5

guided by two well-settled principles:  one, the United States is immune from suit unless it has waived its immunity and consented to suit;  and two, such waivers of sovereign immunity are to be construed narrowly.  *E.g., Gregory v. Mitchell,* 634 F.2d 199, 203 (5th Cir.1981);  *Loomis v. Priest,* 274 F.2d 513, 518 (5th Cir.1960), *cert. denied,* 365 U.S. 862, 81 S.Ct. 828, 5 L.Ed.2d 824 (1961).

"Because the question whether the [United States] has waived its sovereign immunity against suits for damages is, in the first instance, one of subject matter jurisdiction, every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower court in a cause under review." *Mocklin v. Orleans Levee Dist.,* 877 F.2d 427, 428 n. 3 (5th Cir.1989).  The starting point for our inquiry, then, is whether federal subject matter jurisdiction exists over this case.  This question is, needless to say, subject to *de novo* review.  We specifically held open the question of subject matter jurisdiction when this case was before us on an earlier appeal. *See In Re Petition of Price,* 723 F.2d 1193, 1195 (5th Cir.1984).

Although Price pressed several theories of recovery in his original complaint, his position before us is that the United States converted the watercolors and archives when they refused his demands for their return in the early 1980s.  Price's claims are tort claims.  If the district court's jurisdiction is to be sustained, therefore, this suit must fall within the waiver of sovereign immunity contained in the Federal Tort Claims Act.

The parties are in agreement that only 28 U.S.C. § 1346(b) could have provided a basis for subject matter jurisdiction in this case.  It provides:

> Subject to the provisions of [28 U.S.C. § 2671-2680], the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b) (1988).  It bears emphasis that § 1346(b) conditions the existence of subject matter jurisdiction upon other provisions of the Federal Tort Claims Act.  For this reason, we cannot simply assume that subject matter jurisdiction exists and treat a jurisdiction-centered challenge as a challenge on the merits.  *Compare Sierra Club v. Shell Oil Co.,* 817 F.2d 1169, 1172 (5th Cir.), *cert. denied,* 484 U.S. 985, 108 S.Ct. 501, 98 L.Ed.2d 500 (1987).  Instead, we must examine the record in the light of the specific exceptions to, and limitations on, the consent of the United States to the jurisdiction of the district court and ensure that the claims in this case do not fall within any of them.  We will consider, in order, the claims concerning (A) the watercolors, (B) the Washington archive, and (C) the Carlisle archive.

A

We consider first the four watercolors and, specifically, the question whether the claim for them arose in the United States. Although the Federal Tort Claims Act vests the district court with subject matter jurisdiction over a claim against the United States

7

"where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), the district court does not have jurisdiction under 28 U.S.C. § 2680(k) if a claim arises in a foreign country. *Eaglin v. U.S., Dept. of Army,* 794 F.2d 981, 982 (5th Cir.1986). With respect to the watercolors, the initial question is where did the tort of conversion occur. If the conversion occurred in Germany, the district court obviously did not have jurisdiction to hear this claim.[4] The fact that the United States did not contest the evidence presented by Price in support of his summary judgment motion simplifies our task, as we may assume that Price's evidence establishes the facts for this issue.

For the purpose of our basic jurisdictional inquiry, we find that the essence of the tort of conversion under both German and American law is an act by another that is inconsistent with an owner's interest in his personal property. *Compare* 3 German Civil Code §§ 858, 992 (Rothman ed. 1994) *with* Restatement (2d) of Torts, §§ 222A, 234. Simply put, our jurisdictional inquiry is: at what stage of its handling of the watercolors did the United States commit an act that was inconsistent with Hoffman's interest?

---

[4]The fact that Germany was occupied, or indeed whether the German law was applicable, has no bearing on the effect of § 2680(k). The Supreme Court has defined the term "country" as "a region or tract of land." *See Smith v. United States,* --- U.S. ----, ----, 113 S.Ct. 1178, 1181-83, 122 L.Ed.2d 585 (1993) (holding that a claim arising in Antarctica, which has neither an organized government nor a regime of laws, falls within § 2680(k)).

8

Price's summary judgment evidence establishes that the watercolors were stored during the war in a castle in Germany, and that they were found and collected by United States troops. We will accept Price's summary judgment evidence as showing that the discovery and first taking by the United States of the watercolors from the castle to the collecting point was not inconsistent with Hoffman's interest, and therefore did not constitute an act of conversion. From there, like all art that was discovered in the theater of operations, the watercolors were channeled through collecting points that were established by the United States Army. At the collecting points, each piece of art was identified, photographed, cataloged, and stored until the owners could be identified and reunited with their properties. We will accept Price's argument that these actions of the United States Army did not constitute a completed act of conversion.

At this point, however, the facts take an unfavorable turn to Price's argument. Price submitted a deposition by a German citizen who processed art at the central collecting point in Munich to which the watercolors were brought. Based on "property cards"[5] shown to her in the course of the deposition, the deponent testified that the watercolors bore the name "Hoffman," signifying that Hoffman was the owner, and that despite this fact, the United

---

[5]The central collecting point in Munich maintained a "Property Card Art" for each piece of art processed there, containing information on the piece itself and the handling of the piece through final disposition.

States military authorities ordered them "confiscated"[6] and had the watercolors transferred to Wiesbaden, from which they were shipped to the United States. The deponent further testified that two of the watercolors were "confiscated" because they were "military objects."[7] The card for one of the watercolors specifically describes it as a "militaristic Nazi object."[8] Crucially, this deposition testimony reflects that other artwork in Hoffman's collection—artwork not by Adolf Hitler, but similarly labeled "Hoffman" and found along with the Hitler watercolors and shipped to the central collecting point in Munich—was returned to Hoffman's son at about the same time that the watercolors were confiscated.

---

[6]The deponent used the term "confiscated" or "confiscation" a number of times in her testimony.

[7]For example:

> Question 87m: Why was this painting transferred to the "Wiesbaden Collecting Point" from the Munich "CCP"?
>
> Answer: Because it was identified as a military object, and it was confiscated.
>
> Question 87n: On the reverse side of this Card, there is an [sic] notation "29.6.50 to Washington, D.C." What was the occasion for this entry to be made on this "Property Card Art" and what does it mean?
>
> Answer: This means that the American authorities gave orders to the Wiesbaden Collecting Point. Yes, to transfer this painting as confiscated "military object" to Washington, D.C.

[8]The district court appears to have ignored this evidence when it found that the watercolors were "never removed from Germany for the purpose of deNazification." 707 F.Supp. at 1471. It dismissed the possibility that the watercolors "could be "rallying points for a possible revival or Nazism.' " *Id.* at 1470-71. The propriety of their characterization, however, is not at issue.

The divergent treatment afforded various pieces of art in the Hoffman collection convincingly establishes that the conversion of the watercolors, i.e., an act inconsistent with the Hoffman family's interest in them, occurred when the United States military authorities ordered their transfer to Wiesbaden and their shipment to the United States.

Price asserts that the United States Army's own rules of warfare, contained in the *Laws of Land Warfare* and *International Law,* as well as the Hague Convention Respecting the Laws and Customs of War on Land, did not authorize the United States to keep the watercolors once it had taken them; therefore, it must have held them, unaware of the true owner, in some sort of bailment, or other relationship. As a consequence, Price contends that the United States could not have converted the watercolors until it refused his demands in the 1980s. It follows, he argues, that the conversion occurred in the United States where his requests for their return were rejected.

We must disagree with the conclusion Price draws from the Army's rules of war and the Hague Convention. Although we do not reach the issue whether these or other rules apply to the conduct of the United States Army in Germany during the war and occupation, our determination that the seizure and shipment of the watercolors from Germany was an act of conversion is buttressed to the extent that such rules may have applied so as not to permit the lawful taking of these watercolors. In other words, an unlawful confiscation of the watercolors only lends additional support to

11

our conclusion that an act plainly inconsistent with Hoffman's interest occurred in Germany. In sum, even if we agree with Price that the initial recovery of the watercolors may have created some sort of a bailment—or at least may not have amounted to a conversion—it does not follow that the United States continued to hold them in some bailment relationship until the 1980s, when Price demanded their return. The evidence before the district court points only to the conclusion that the United States Army converted the watercolors when it "confiscated" them in Germany and shipped them to the United States.

Before we leave the watercolors, we should address the error of the district court's ruling in this respect. The district court concluded that some sort of bailment relationship existed vis-á-vis the watercolors and that Price's claim did not arise until the duty to redeliver arising from the bailment was breached by the United States. *See* 707 F.Supp. at 1469-70. The district court's legal conclusion appears to stem in part from its treatment of the three groups of property at issue in this case *en masse. Id.* Although we do not reach the issue whether a bailment existed as to the Washington archive, the record appears to contain some evidence that could be so construed. That evidence, however, will not support a conclusion that the *watercolors* were held in bailment. The evidence concerning the watercolors to which the district court specifically points is simply insufficient to conclude that a bailment existed. *Id.* at 1476. The district court appears to focus almost exclusively on the actions taken in 1945. *Id.*

12

Significantly, the district court neither mentions nor disposes of the crucial fact that non-Hitler artwork owned by the Hoffmans was treated differently in the years after 1945.

The fact that the Hoffmans did not know the fate or whereabouts of the watercolors until the early 1980s does not change the nature of the acts of the United States committed in Germany after the war. Instead, their lack of knowledge goes to the issue whether the claim accrued for the purposes of the statute of limitations contained in 28 U.S.C. § 2401(b). Because we dismiss the claim for the watercolors on the basis of the "foreign country" exception, however, we need not reach that issue.

Having thoroughly reviewed the summary judgment record before the district court, we find that it simply will not support a conclusion that the tort of conversion did not arise in Germany. As a consequence, Price's conversion claim falls within § 2680(k)'s exception of "claim[s] arising in a foreign country." The claim, therefore, is not within the waiver of sovereign immunity, and, consequently, the district court was without subject matter jurisdiction over the conversion claim relating to the watercolors.

B

We turn next to the Washington archive. The record reflects that the archive was used at the Nuremberg war trials with the assistance of Hoffman and his son, and that the United States engaged Heinrich Hoffman, Jr. thereafter to complete a pictorial history of Germany. The project was cut short, however, and the archives were shipped to the United States about the time of the

13

Berlin airlift.  On June 25, 1951, the Attorney General, acting pursuant to the Trading with the Enemy Act, 50 U.S.C.App. § 1-33, vested in himself all rights in the photographs and photographic images "to be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States."  *See* Vesting Order 17952, 16 Fed.Reg. 6162.

This vesting order, we are convinced, places Price's claim in respect of the Washington archive outside of the subject matter jurisdiction of the district court.  Pursuant to § 2680(e), claims "arising out of an act or omission of any employee of the Government in administering the provisions of [The Trading with the Enemy Act]" are excepted from the waiver of sovereign immunity.  28 U.S.C. § 2680(e) (1988).  In a brief and well-reasoned opinion, the D.C. Circuit has read this exception to prevent efforts by plaintiffs to use the Federal Tort Claims Act to circumvent the provisions of the Trading with the Enemy Act.  *Gubbins v. United States,* 192 F.2d 411 (D.C.Cir.1951) (rejecting a defamation claim based on the plaintiff being placed on a list of persons pursuant to the Trading with the Enemy Act that blocked them from engaging in certain transactions);  *see also Schilling v. Rogers,* 363 U.S. 666, 674-76, 80 S.Ct. 1288, 1294-95, 4 L.Ed.2d 1478 (1960) (holding that the Trading with the Enemy Act's provisions for judicial review are exclusive of any other remedy, and rejecting arguments that judicial review of actions taken under the Trading with the Enemy Act is available via the Administrative Procedure Act).  The reasoning of *Gubbins* is applicable here and we similarly hold that

14

Price's claim with respect to the Washington archive is not within the Federal Tort Claims Act and is cognizable, if at all, under the Trading with the Enemy Act.

Price attempts to avoid the application of this exception by challenging the validity of the vesting order itself. We find it unnecessary, however, to consider the merits of his challenge: it is clear to us that, to the extent that he may have presented the merits of such a challenge, he is required to have done so pursuant to § 9 of the Trading with the Enemy Act. Furthermore, by the terms of § 33 of the Act, the time to bring such a suit has long since passed. "No suit pursuant to § 9 ... may be instituted ... after the expiration of two years from the date of the seizure by or vesting in the Alien Property Custodian, as the case may be, of the property or interest in respect of which relief is sought." 50 U.S.C.App. § 33 (1988). By these terms, Price must have filed his suit not later than June 25, 1953. His suit was not filed, however, until more than thirty years past that date.

Price argues that, because the United States did not raise § 33 as an affirmative defense before partial summary judgment was granted, it cannot be raised now to bar this claim. Price is mistaken. The Trading with the Enemy Act, like the Federal Tort Claims Act, constitutes a waiver of the sovereign immunity of the United States. By its terms, § 33 declares that "no suit ... may be instituted" unless certain conditions have been met. We have held that § 33 is a limitation on the waiver of sovereign immunity, and that the right to bring an action to challenge is extinguished

15

unless the action is instituted within the time prescribed by the statute. *Loomis,* 274 F.2d at 518; *see also Pass v. McGrath,* 192 F.2d 415, 416 (D.C.Cir.1951), *cert. denied,* 342 U.S. 910, 72 S.Ct. 302, 96 L.Ed. 681 (1952). To the extent that *anyone* might have challenged the vesting order in this case, such a challenge was no longer available after June 25, 1953, a full three decades before this suit was brought.

As an alternative, Price urges us to recognize an equitable exception to the sovereign immunity of the United States and permit a collateral attack on the vesting order. Price analogizes this case to *Enochs v. Williams Packing and Navigation Co.,* 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). In *Enochs,* the Supreme Court held that an injunction may issue against the assessment or collection of federal income taxes, notwithstanding a specific statutory prohibition against such injunctions, if the assessment or collection could not be valid under any theory. Price argues that the vesting order similarly cannot be valid and, as a consequence, notwithstanding the fact that § 33 *withdraws* the sole basis for jurisdiction over a challenge to the vesting order, and thus revokes the limited waiver by the United States of its sovereign immunity, we should permit a challenge. Price reads *Enochs,* in short, to permit us to fashion an equitable waiver of sovereign immunity. We cannot agree. First, our precedent forecloses any possibility that the *Enochs* rule can be used to manufacture subject matter jurisdiction. We have recognized that application of *Enochs* requires two conditions: "(1) it is clear

16

that under no circumstances could the government ultimately prevail on the merits of its claim, and (2) *equity jurisdiction otherwise exists."* *Lange v. Phinney,* 507 F.2d 1000, 1003 (5th Cir.1975) (emphasis added). It is clear that the *Enochs* rule can apply only when there is some independent basis of jurisdiction: *Enochs* cannot supply a basis for jurisdiction where none exists. More fundamentally, however, the sovereign immunity of the United States is defined by "the language the sovereign used in giving up a portion of its immunity, and *no conflicting considerations of equity may be entertained in judging the claim asserted."* *Loomis,* 274 F.2d at 518 (emphasis added). It is plain to us, in sum, that the district court was without subject matter jurisdiction over Price's claim with respect to the Washington archives.

C

Finally, we turn to the claim with respect to the Carlisle archive. This archive is much less substantial than the Washington archive—the district court determined that its fair market value in 1983 was $9,000, a small fraction of a percent of the Washington archive's 1983 fair market value of $2.625 million. The record is considerably less developed on this archive. It appears, for instance, that the United States was given these photographs in separate lots in 1981 and 1983, but the record does not indicate which photographs were given and when. Regardless of these uncertainties, however, we harbor no doubts that the claim with respect to the Carlisle archive must be dismissed. The subject matter jurisdiction of the court is conditioned on compliance with

17

28 U.S.C. § 2675(a), which declares that "an action shall not be instituted" unless the plaintiff has filed an administrative claim and either obtained a written denial or waited six months. 28 U.S.C. § 2675(a) (1988). An action that is filed before the expiration of the six-month waiting period, and is thus untimely, cannot become timely by the passage of time after the complaint is filed. *See McNeil v. United States,* --- U.S. ----, ----, 113 S.Ct. 1980, 1983, 124 L.Ed.2d 21 (1993). This requirement is jurisdictional, and may not be waived. *Gregory,* 634 F.2d at 203-204.

Price admits that he has not complied with this requirement. He raises two arguments, however, in support of excusing the strict requirement of § 2675(a). First, he argues, the oral denial by the United States Attorney of his claim with respect to this archive satisfies § 2675(a). Second, he argues, the government should be estopped from raising his noncompliance with this requirement because he was following their advice. Neither of these arguments is persuasive because the words of the statute are directly to the contrary: § 2675(a) requires, unequivocally, that "his claim shall have been finally denied by the agency in writing and sent by certified mail." This is a "clear statutory command," *McNeil,* --- U.S. at ----, 113 S.Ct. at 1984, and we cannot find a waiver of sovereign immunity where, as here, the plaintiff has filed a suit against the United States without complying with its terms.

### III

In the end, for the reasons we have set out above, the

18

district court was without subject matter jurisdiction over this case. The United States may dispose of items that were seized during the allied occupation of Germany as it sees fit; indeed, it has done so. *See* Act of March 17, 1982, Pub.L. No. 97-155, 96 Stat. 14 (authorizing the Secretary of the Army to transfer title and custody of certain works of art seized from the German government during World War II). Without subject matter jurisdiction the federal courts are powerless, however, to order it to pay damages in connection with its decision with respect to these watercolors and photographic archives. We therefore REVERSE the judgment of the district court, and REMAND for entry of an order of dismissal. The dismissal of Price's claims with respect to the watercolors and the Washington Archive must be with prejudice. The claims with respect to the Carlisle archive, however, will be dismissed without prejudice to a separate lawsuit pending in the district court. We express no opinion on any aspect of that suit, including any arguments raised on appeal but not addressed by this court. Finally, in the light of our determination that the district court lacked subject matter jurisdiction, we DISMISS Price's cross-appeal on the measure of damages awarded by the district court.

REVERSED and REMANDED for entry of judgment of dismissal; Cross-appeal DISMISSED.

CA(95)5678-1,SIZE-43 PICAS,TYPE-PDI

CA(95)5678-2,SIZE-1 PAGE,TYPE-PI

CA(95)5678-3,SIZE-1 PAGE,TYPE-PI

19

CA(95)5678-4,SIZE-42 PICAS,TYPE-PDI