Robert H. HOFFMANN, Estate of Henriette Hoffman Von Schirach, Heidemarie Kruger and Susanne Hustadt, Plaintiffs,

v.

UNITED STATES of America and Janet Reno, as ex officio Alien Property Custodian, Defendants.

No. Civ.A. 98–0857 (HHK).

United States District Court, District of Columbia.

June 28, 1999.

---

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiffs, German citizens, have brought this action to recover photographic archives and paintings formerly belonging to Heinrich Hoffmann Sr. Their claims are for contract damages and tort damages, and for violations of the Fifth Amendment and the Trading With the Enemy Act.[1]

1. The Consolidated Complaint also purports to state a claim for relief under Article 53, Annex to the Hague Convention IV. Compl. ¶ 5. Within the counts of the complaint, however, the alleged violation of Article 53 serves only as a predicate to the Federal Tort Claims Act claims alleged in Count 17, and, by reference, Count 18. Compl. ¶ 120, 134. The complaint does not state an independent Hague Convention claim.

Before the court are defendants' motion to dismiss or for summary judgment and plaintiffs' motion for summary judgment. Upon consideration of the motions, the responses thereto, and the entire record of this case, the court concludes that defendants' motion for summary judgment should be granted with respect to all claims except for those with respect to the Time–Life archives, as described below.

## I. Factual Background

This lawsuit is "simply a claim for damages resulting from the tortious conversion of chattels" by the United States. *Price v. United States*, 69 F.3d 46, 48 (5th Cir. 1995); *cert. denied*, 519 U.S. 927, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996). The chattels consist of photographic archives compiled by Heinrich Hoffmann ("Hoffmann Sr.") and his son, Heinrich Hoffmann Jr. ("Hoffmann Jr.") and four watercolor paintings by Adolf Hitler. Plaintiffs are the Estate of Henriette von Schirach, Hoffmann Sr.s daughter, Robert H. Hoffmann, Heidemarie Kruger, and Susanne Hustadt.

According to a biographical record submitted by plaintiffs, during World War I, Hoffmann served as a photographer in the Bavarian army. He first met Adolf Hitler in 1919, "the beginning of an intimate personal relationship":

> Hitler would often visit the Hoffmanns' home in Munich for relaxation. It was through the photographer that the future leader of the Third Reich first met Eva Braun who worked in his shop, and Hoffmann also frequently drove him to the Wagner home in Bayreuth to see Frau Winifred Wagner. In 1920 Hoffmann joined the [National Socialist Workers' Party] and soon belonged to the inner circle of Hitler's intimate companions. The only man allowed to photograph the Führer, he accompanied him everywhere on his road to power and later, during World War II, travelled with him to all the various fronts. Hoffmann's two-and-a-half million photographs provide a unique record of twenty-five years of German history and helped to make him an enormously wealthy man, as well as enriching Hitler himself and enhancing his popularity.... It was Hoffmann's idea that Hitler should receive a royalty for every photograph of himself which appeared on a postage stamp, which led to the accumulation of enormous sums of money to the Führer's account. Hoffmann was tried as a Nazi profiteer in 1947, sentenced to ten years' imprisonment (later reduced to three, then raised to five years in 1950) and nearly all of his personal fortune was confiscated. He died in Munich on 16 December 1957.

Robert Wistrich, Who's Who in Nazi Germany 155, Pl.Ex. 405, Attach. 12; see also 1 Christian Zentner & Friedemann Bedürftig, eds., The Encyclopedia of the Third Reich 437 (Amy Hackett trans., 1991). But see Pl.'s Br.Supp.Summ.J. at ¶ 19 (stating that Hoffmann's sentence was for four years).

In addition to his work for Hitler, from 1905 to 1945 Hoffmann Sr. owned and operated his family's photography business in Germany, which included a portrait studio, a fine arts press, and a well-known press photography agency. Beginning with a collection of photographs dating from the 1860s through the early 1900s that he had obtained from his grandfather, father, uncle, Hoffmann Sr. built a vast archive of photographic images.

Hoffmann Jr. joined his father's business in the mid–1930s, and managed the press agency and a fine arts magazine from 1940 to 1945. In 1937 Hoffmann Sr. transferred all of his then-existing photographic archives to Hoffmann Jr. After that date, both father and son continued to accumulate photographs in their respective archives.

According to plaintiffs, the U.S. Army in May 1945 seized the portion of the Hoffmann archives that had been stored in the town of Winhöring. In late 1945, the U.S. sent part of the archives seized in Winhöring to Nürnberg for use by the War

Crimes Commission from 1945 to 1949. This "Nürnberg archive" was subsequently transferred to the Army's Historical Division in Frankfurt on April 27, 1949, and thereafter shipped to the Army's German Military Documents Section in Alexandria, Virginia, on October 26, 1949. On May 31, 1951, the Assistant Attorney General and Director of the Office of Alien Property executed an order vesting all rights, title, interest and claim in the Nürnberg archive in the Attorney General of the United States. Ex. P–133.

In addition to the photographic archive covered by the vesting order, plaintiffs allege that the Army also continues to possess the remainder of the archives that were seized in Winhöring, as well as "missing" portions of the Hoffmann photographic archives that had been seized by the Army in Freising and Bavaria. *See* Pl.'s Statement of Facts ¶ 39–40.

Plaintiffs also allege that the Army possesses four watercolors painted by Hitler that Hoffmann Sr. acquired during the 1930s and 1940s. After the war, United States troops discovered the watercolors in the village of Dietramszell and transferred them to a central collecting facility in Munich. The military authorities there in 1949 ordered the paintings to be transferred to Wiesbaden, from where they were shipped to the United States. Pl.'s Statement of Facts ¶ 68–71, 73.

Between 1949 and 1951, Hoffmann Jr. wrote various officers of the Historical Division protesting the Army's transfer of his "entire photo archive" to the United States. *See* Ex. P–85; *see also* P–93, P–97, P–99, P–105, P–109, P–125. Unbeknownst to Hoffmann Jr., however, a further portion of the Hoffmann photographic archives had been taken from Hoffmann's Berlin studio in May 1945 by a LIFE magazine photographer. *See* Ex. P–163. These archives (the "Time–Life archives") came into the possession of the United States in the early 1980s, when Time–Life Inc. donated it to the U.S. Military History Institute in Carlisle, Pennsylvania.

Plaintiffs in the present case, together with Texas businessman Billy Price, initially brought suit for the return of the watercolors and photographic archives in the Southern District of Texas in 1983. The district court entered a partial summary judgment on the issue of liability in Price's favor. *Price v. United States,* 707 F.Supp. 1465 (S.D.Tex.1989). On appeal, the Fifth Circuit reversed and remanded for entry of judgment of dismissal with prejudice as to the claims for the watercolors and the photographic archives other than the Time–Life archives. 69 F.3d 46, 54 (5th Cir.1995). Finding that Price had failed to exhaust administrative remedies with respect to the Time–Life archives, the appeals court dismissed the claims for those archives without prejudice. *Id.* On petition for rehearing, the Fifth Circuit noted that the vesting order did not cover all of the Hoffmanns' photographic archives alleged to have been seized by the Army in Germany. 81 F.3d 521 (5th Cir.1996). Accordingly, the Fifth Circuit held that with respect to the archives not covered by the vesting order, its dismissal was also without prejudice to the present lawsuit.

The instant case was consolidated in the Southern District of Texas on October 2, 1997, from two actions brought by the same plaintiffs, including Price, in 1989 and 1997. That court held that a conveyance to Price by plaintiffs von Schirach and Hoffmann Jr. of their interests in the photographic archives was an assignment of a claim against the United States in violation of the Anti–Assignment Act. Accordingly, on March 24, 1998, Price was dismissed as a plaintiff, and the case was transferred to this court.

The claims remaining in the consolidated complaint are as follows. Plaintiff Estate of von Schirach seeks damages for breach of contract or violation of the takings clause of the Fifth Amendment (count 3), and specific performance (count 4), with respect to the watercolors. All plaintiffs seek damages for the General Services

Administration's refusal to turn over the photographic archives not covered by the vesting order to von Schirach and Hoffmann Jr. under tort law (count 9) and the Federal Tort Claims Act (count 10). All plaintiffs also seek damages for breach of contract or violation of the takings clause of the Fifth Amendment (count 11), and specific performance (count 12), with respect to the photographic archives not covered by the vesting order. For the Army's failure to return the Time/Life archives, plaintiffs seek damages under tort law (count 13) and the takings clause of the Fifth Amendment (count 14), and specific performance (count 15). With respect to the archives covered by the vesting order, plaintiffs seek review of the validity of the vesting order under the Trading With the Enemy Act and the takings clause of the Fifth Amendment (count 16), and damages for conspiracy and fraudulent concealment under the Federal Tort Claims Act (count 18).

## II. Standards of Review

### A. Dismissal

A Rule 12(b)(6) motion "tests the legal sufficiency of the complaint." *ACLU Foundation of Southern Calif. v. Barr*, 952 F.2d 457, 472 (D.C.Cir.1991). When reviewing such motions, the court must take the allegations in non-movant's pleading as true and must construe them in a light most favorable to the non-moving party. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Sinclair v. Kleindienst*, 711 F.2d 291, 293 (D.C.Cir. 1983). Reviewed in this light, a motion to dismiss may not be granted "unless it appears that a plaintiff can prove no facts in support of the claim which would entitle the plaintiff to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99.

### B. Summary Judgment

A motion for summary judgment should be granted if and only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party's "initial responsibility" consists of "informing the [trial] court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted).

If the moving party meets its burden, the burden then shifts to the non-moving party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C.Cir. 1987). Such evidence must consist of more than mere unsupported allegations or denials and must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 322 n. 3., 106 S.Ct. at 2552 n. 3. If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## III. Discussion

### A. The Contract/Bailment Claims

The United States is "immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (quotation omitted). While the Tucker Act, 28 U.S.C. § 1491(a), confers jurisdiction to hear and determine claims against the United States founded upon any "express or implied" contract with the United States, "this jurisdiction

extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Hercules Inc. v. United States,* 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). Accordingly, plaintiffs have alleged the existence of contracts implied in fact binding the United States to return each of the properties in issue in this case.

### 1. The Archives Covered by the Vesting Order

Plaintiffs contend that an "implied-in-fact bailment" was created between the Army and the Hoffmanns whereby there was a "fiduciary obligation that, some day the Army would have to return the Nürnburg photographic archives to the Hoffmanns and pay compensation." Pl.'s Statement of Facts ¶ 32 (citing Ex. P–129 and P–91, ¶ 5). As principal support for this theory, plaintiffs offer the following text from a March 28, 1951, decision of the Judge Advocate General:

> Assuming, as is stated in the submitted file, that the Hoffmann photographic file was seized in furtherance of the objectives set out in subparagraph 3–III of the Potsdam Agreement, it is the opinion of this office that the mentioned photographic file is being legally held by the Department of the Army.

Ex. P–129. Plaintiffs also cite a January 24, 1950, memorandum from the Special Staff of the Historical Division in Washington to the division's European office noting "the possibility, if we use the Hoffmann file, that under the provisions of Article 53, Annex to the Hague Convention IV, the Army could be required to return it and fix compensation for its use when peace is made." Ex. P–91, ¶ 5.

■ To demonstrate an implied-in-fact contract binding the United States within the meaning of the Tucker Act, plaintiffs must show "mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the government in contract." *Ysasi v. Rivkind,* 856 F.2d 1520,

1525 (Fed.Cir.1988) (quoting *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985)). Thus, an implied-in-fact contract "must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention." *Cutler–Hammer v. United States,* 194 Ct.Cl. 788, 441 F.2d 1179, 1182 (1971). For the government to be bound by an implied-in-fact bailment, there must be "a promise, representation or statement by any authorized government official" that the property would be returned. *See id.* (citation omitted).

■ The record, however, is devoid of any promise, representation or statement by an authorized official to the Hoffmanns having either the purpose or effect of communicating an offer to return the archives. The Judge Advocate General's decision, far from suggesting that the archives would be returned to the Hoffmanns, concludes that the archives were "being legally held" by the Army. The Historical Division's internal memorandum notes a "possibility" that the Army would be required to return the archives, but nowhere contains a promise, representation or statement that it would actually do so.

Each of the other documents offered in support of plaintiffs' bailment theory refers to the return of the archives as a possibility or contingency, not as an undertaking. *See* Letter from Harry J. Malony, Chief of the Historical Division in Washington, to the Historical Division in Europe, of 12/30/48, Ex. P–74 (opining that "technically, his files are probably his personal property"); Memorandum from Maj. Raymond D. Hill to Col. Potter of 3/14/49, Ex. P–79 (noting that "Capt. Paul stated that he had previously been under the assumption that the collection would revert to the ownership of Hoffmann upon completion of its use"); Letter from Lt. Col. E.M. Harris to the Historical Division in Europe, Ex. P–87 (stating that "[i]t seems likely" that the file will have to be re-

turned to its original owner in Germany); Memorandum of Judge Advocate General of 11/18/49, Ex. P–90 (finding that the Nürnberg archive was "propaganda which is aimed at keeping alive, reviving or promoting the military or Nazi spirit and institutions, or glorifying war," within the meaning of Control Council Law No. 8, and therefore "may not at present be returned to the owner"); Memorandum from W.S. Nye, Chief of Historical Division in Europe, to Col. Hanley, Judge Advocate Division of 2/5/51, Ex. P–127 (stating that "[i]f it can be proven that a part of the Hoffmann Photographic File does not fall within the classification of property the existence of which is prejudicial to the United States Government and any of its agencies," retention of the Hoffmann Photographic File by the United States cannot be justified legally). None of these documents is addressed to the Hoffmanns or appears in any way to have been intended as a communication to the Hoffmanns regarding the archives. Moreover, to the extent that these statements simply express tentative legal conclusions as to the ownership of the archives, "this would at most create a bailment by operation of law, not an implied-in-fact bailment contract." *Ysasi*, 856 F.2d at 1526.

Plaintiffs also present various recorded testimony of Hoffmann Jr. to the effect that he "was assured on many occasions by officials of the War Crimes Commission that when the Nürnberg proceedings against German industrialists were completed, the Hoffmann Photographic Archives at Nürnberg would be returned to Hoffmann Jr." Pl.'s Statement of Facts ¶ 21. This testimony, however, is unaccompanied by any allegations or evidence of such officials' authority to bind the United States Government. *See* Letter of Heinrich Hoffmann Jr., Ex. P–85 ("I repeatedly received confirmation from various persons that interest in [the archive] would only last for the duration of the Nuremberg Court Trials"); Letter of Heinrich Hoffmann Jr., Ex. P–109 (stating that "I was assured by U.S. officials at Nuremberg that my photo archives were regarded by the U.S. Army as a loan for the duration of the trials"); Dep. of Heinrich Hoffmann Jr., Ex. P–230, at 15 (stating that General Potter "gave me his word that when the books were finished, the entire archives would be brought to location which I would designate," but later received orders to ship the archives to the United States); Affidavit of Heinrich Hoffmann Jr. & Claus Offermann, Ex. P–244, at ¶ 11 (stating that Hoffmann "understood that the United States Government would conclude its use of the photographic archives and return them to him"). Accordingly, such testimony does not carry the burden of showing that an implied-in-fact contract was made. *Pasco Enterprises v. United States*, 13 Cl.Ct. 302, 306–07 (1987).

The court therefore finds that plaintiffs have failed to raise a genuine issue of material fact in support of the theory that an implied-in-fact bailment was created with respect to the Nürnberg photographic archives.

## 2. The Photographic Archives Not Subject to the Vesting Order

Plaintiffs assert that the Army also had control of the photographic archives not subject to the vesting order under an express or implied-in-fact bailment "with the fiduciary duties of accounting, returning, and compensating." Plaintiffs do not provide specific support for a finding that such bailments or fiduciary duties existed, but state simply that "[t]he same principles discussed *supra* respecting the archives made subject to the vesting order are applicable here." Pl.'s Br. Supp.Mot.Summ.J. at 118. Accordingly, the court finds that plaintiffs have failed to raise a genuine issue of material fact in support of the theory that an implied-in-fact bailment was created with respect to the photographic archives not subject to the vesting order.

## 3. The Watercolors

■ Plaintiffs also allege that an implied-in-fact bailment was created when

the Army took possession of the four Hitler watercolors upon occupying Schloss Dietramszell in 1945 and removed them to the Munich Central Collection Point in May 3, 1946. Pl.'s Statement of Facts ¶¶ 68, 76–77.

In support of this theory, plaintiffs do not allege that the government ever suggested or opined, let alone represented or promised, that the watercolors would someday be returned to the Hoffmanns. Instead, plaintiffs cite deposition testimony of Rosemarie Huber and Elga Böhm that the Munich Central Collection Point was established with the purpose of "identification and return of objects of arts to their rightful owners." Böhm Dep., Ex. P–239, at 10; see also Huber Dep., Ex. P–234, at 7 (testifying that objects of art were brought "to Munich to be registered here, and to be returned to the former owners"). Plaintiffs also paraphrase extensive passages from Lynn H. Nicholas, *The Rape of Europa*, for the proposition that the U.S. government had classified certain works of art as "property of the German nation or the private property of Germans" with the intention of serving as a "trustee" for all such property that was removed to the United States. Pl.'s Statement of Facts at 26–27 n. 9.

Even in the light most favorable to plaintiffs, this evidence regarding the general purpose of the Munich Central Collection Point and the intention of the U.S. government with respect to a general category of property is insufficient to support the specific inference that the Army brought the four Hitler watercolors to the Munich Central Collection Point with the intention of returning them to the Hoffmanns, let alone that such an intention was ever communicated to the Hoffmanns. Accordingly, the court finds that plaintiffs have failed to raise a genuine issue of material fact to support the finding of an implied-in-fact bailment with respect to the Hitler watercolors.

## B. The Fifth Amendment Claims

■ Plaintiffs' takings claims are based on the proposition that "non-resident friendly aliens are also entitled to the protection of the Fifth Amendment's prohibition on unlawful taking for public use of their property in the United States without just compensation." See Pl. Br.Supp.Mot.Summ.J. at 102 (citing *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491, 51 S.Ct. 229, 75 L.Ed. 473 (1931)). In *Russian Volunteer Fleet*, the petitioner, a Russian corporation, was the assignee of certain contracts for the construction of two vessels by a New York shipbuilding corporation. 282 U.S. at 487, 51 S.Ct. 229. When the United States requisitioned these contracts, the Court held that the United States had exerted the power of eminent domain in taking the petitioner's property and thereby became bound to pay just compensation. *Id.* at 489, 51 S.Ct. 229.

In finding that the Russian Volunteer Fleet was an "alien friend," the Court cited *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), a case which, while affirming the power of Congress to exclude aliens on the basis of race (as race was then legally constructed), permitted Fifth and Sixth Amendment claims as minimal due process protections for those aliens who had already established residence in the United States. The more general proposition that *non-resident* friendly aliens with no voluntary or contractual relationship with the United States are entitled to Fifth Amendment rights, however, was emphatically rejected by the Supreme Court in *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950):

Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. None of the

learned commentators on our constitution has even hinted at it. The practice of every modern government is opposed to it.

*Id.* at 784, 70 S.Ct. 936; see also *United States v. Verdugo–Urquidez,* 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) ("Indeed, we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States.").

In *Verdugo–Urquidez,* the Court reviewed a series of cases, including *Russian Volunteer Fleet,* that had been cited by the respondent in support of the view that aliens enjoy certain constitutional rights. *Id.* at 270–71, 110 S.Ct. 1056. The court concluded that "[t]hese cases ... establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271, 110 S.Ct. 1056. The respondent was "an alien who has had no previous significant voluntary connection with the United States, so these cases avail him not." *Id.*

Plaintiffs and their predecessors, self-described as "non-resident," have failed to establish the existence of voluntary or contractual relationships with this country that could reasonably be characterized as "substantial connections." Nor have plaintiffs alleged that the United States seized, vested or acquired any of the property pursuant to its eminent domain power. Accordingly, the court will dismiss plaintiffs' Fifth Amendment claims.

## C. The Trading With the Enemy Act Claim

■ Plaintiffs challenge the validity of the vesting order under the Trading With the Enemy Act, 50 U.S.C.App. § 9. That statute provides that "[a]ny person not an enemy or ally of enemy claiming any interest, right or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him ... may file with the said custodian a notice of his claim...."

As the Fifth Circuit noted, § 33 of the Act bars claims under § 9 instituted "after the expiration of two years from the date of the seizure by or vesting in the Alien Property Custodian, as the case may be, of the property or interest in respect of which relief is sought." 69 F.3d at 53 (quoting 50 U.S.C.App. § 33 (1988)). Plaintiffs implicitly acknowledge this time bar. *See* Pl.'s Br.Supp.Mot.Summ.J. at 83 ("The only question that remains is can Hoffmann Jr. and von Schirach and their successors commence an action in 1989 when C.A. H–89–815 was filed in the Southern District of Texas?"). They argue, however, that "[n]o statute of limitations runs in favor of a fiduciary who steals or mistreats the property entrusted to him so long as the fiduciary relationship is not expressly repudiated and such repudiation is communicated to the beneficiary by the malfeasor-fiduciary." *Id.* Whether or not this proposed rule of law is valid and applicable to § 33, plaintiffs have failed to offer facts that show the existence of a fiduciary relationship between the Army and Hoffmann Jr. regarding the vested property. Accordingly, the court finds that plaintiffs have failed to raise a genuine issue of material fact as to whether the validity of the vesting order can be reviewed.[2]

---

**2.** While it is not necessary for the court so to find, plaintiffs' challenge to the vesting order itself appears to be without merit. Plaintiffs contend that vesting order authority under the Act extended only to property that was physically located in the United States prior to December 31, 1946, when President Truman signed a proclamation permitting the resumption of trade between Germany and the United States. Pl.'s Mem.Supp.Summ.J. at 75. The caselaw cited by plaintiffs, however, does not support this proposition. *See Cities Service Co. v. McGrath,* 342 U.S. 330, 333, 72 S.Ct. 334, 96 L.Ed. 359 (1952) (holding that vesting in of debentures physically located outside of the United States fell within "broad terms" of TWEA's vesting authority); *Rogers v. Smith,* 185 F.Supp. 401 (S.D.Ill.

## D. The Tort Claims

### 1. The Watercolors

In *Price*, the Fifth Circuit held that the Federal Tort Claims Act did not confer jurisdiction over a claim against the United States for conversion of the watercolors if an act "inconsistent with [Hoffmann]'s interest in his personal property"; i.e., the watercolors, occurred in Germany. 69 F.3d at 50. Upon reviewing the deposition testimony, submitted by Price, of a German citizen who processed art at the Munich Central Collection Point, the court determined that "other artwork in Hoffmann's collection—artwork not by Adolf Hitler, but similarly labeled 'Hoffmann' and found along with the Hitler watercolors and shipped to the central collecting point in Munich—was returned to Hoffmann's son at about the same time that the watercolors were confiscated." *Id.* at 51. For the court, the "crucial[ ]" fact was that the Army's conduct with respect to the watercolors diverged from its contemporaneous treatment of similarly situated art in a manner that was consistent with the owner's interest:

> The divergent treatment afforded various pieces of art in the Hoffmann collection convincingly establishes that the conversion of the watercolors, i.e., an act inconsistent with the Hoffmann family's

interest in them, occurred when the United States military authorities ordered their transfer to Wiesbaden and their shipment to the United States. *Id. See* Restatement of Restitution § 123 cmt. c, at 508 (1937) ("A person who, having acquired the property of another innocently and non-tortiously but without giving value therefor, learns of the interest of another therein, is under a duty to restore it to the owner within a reasonable time, [a]nd any conduct of his thereafter which is inconsistent with the owner's interest is a conversion. . . ."). The court's finding was further "buttressed to the extent that [the United States Army's rules of warfare] may have applied so as not to permit the lawful taking of these watercolors." *Id.* Accordingly, the Fifth Circuit concluded that the conversion claim did not fall within the waiver of sovereign immunity granted by the Federal Tort Claims Act. *Id.* at 52.

 Under established principles of res judicata, this court is not empowered to review the Fifth Circuit's determination that federal courts lack subject matter jurisdiction over plaintiffs' claim for conversion of the watercolors. As the Supreme Court has long recognized, "[t]he principles of res judicata apply to questions of jurisdiction as well as to other issues." *Underwriters National Assurance Co. v.*

1960) (same); *McGrath v. Agency of Chartered Bank,* 104 F.Supp. 964 (S.D.N.Y.1952), *aff'd sub. nom. McGranery v. Agency of Chartered Bank,* 201 F.2d 368 (2d Cir.1953) (same); *Silesian American Corp. v. Clark,* 332 U.S. 469, 475–76, 68 S.Ct. 179, 92 L.Ed. 81 (1947) (holding that seizure of alien property in time of emergency is a proper exercise of the war power); *Handelsbureau La Mola v. Kennedy,* 299 F.2d 923, 926–27 (D.C.Cir.), *cert. denied,* 370 U.S. 940, 82 S.Ct. 1582, 8 L.Ed.2d 808 (1962) (holding that December 1950 vesting order was proper because "enemy" status under TWEA did not end until the Joint Resolution of Congress of October 19, 1951); *Gmo Niehaus & Co. v. United States,* 145 Ct.Cl. 173, 170 F.Supp. 419, 421 (1959) (holding that property *acquired by Germans* after December 31, 1946 is not subject to vesting). The Supreme Court in *Cities Service Co.* emphasized the breadth of the vesting authority:

> We believe that the Trading with the Enemy Act grants the authority necessary to vest obligations evidenced by domestic negotiable bearer debentures even though the debentures themselves are outside the United States. By s 7(c) of the Act, enacted during World War I, the President is given the authority to seize all enemy property, "including . . . choses in action, and rights and claims of every character and description owing or belonging to . . . an enemy. . . ." At the beginning of World War II, Congress made an even broader grant of authority to the Executive through an amendment to s 5(b), providing that "any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President. . . ."

342 U.S. at 333 (citations omitted).

*North Carolina Life & Accident & Health Insurance Guaranty Association,* 455 U.S. 691, 706, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982) (citing *American Surety Co. v. Baldwin,* 287 U.S. 156, 166, 53 S.Ct. 98, 77 L.Ed. 231 (1932)). Dismissal of a suit for lack of federal subject matter jurisdiction precludes relitigation of the same issue of subject matter jurisdiction in a second federal suit on the same claim. *Oglala Sioux Tribe v. Homestake Mining Co.,* 722 F.2d 1407, 1411 (8th Cir.1983). Accordingly, the court concludes that plaintiffs have failed to raise a genuine issue of material fact in support of relitigating the issue of jurisdiction under the Federal Tort Claims Act for conversion of the watercolors.[3]

### 2. The Photographic Archives Not Covered by the Vesting Order (Other Than the Time–Life Archives)

 Plaintiffs' conversion claims for the photographic archives not covered by the vesting order are subject to the statute of limitations under the Federal Tort Claims Act, which provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b).

 Plaintiffs contend that the claim for conversion for "most" of the archives not covered by the vesting order "accrued" when plaintiffs' "1983 and 1996 demands for the return of those archives were de-nied by the government" in January and February 1997. Pl.'s Br.Supp.Summ.J. at 138. A claim accrues within the meaning of § 2401(b), however, when the plaintiff becomes aware of both the existence and the cause of his injury. *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). In this case, plaintiffs' evidence indicates that on May 20, 1949, Hoffmann Jr. was aware of both the removal and the cause of the removal of the "entire Hoffmann file" to the United States. Hoffmann Jr.'s letter to the Army's Historical Division in Europe on June 17, 1949 states that:

> On 20 May 49 I was informed by Major Murphy, Historical Division, Frankfurt/Main, that my entire photo archive had been forwarded to Washington and I had no right to claim its return.
>
> Because of the foregoing, as owner, I am compelled to lodge protest.

*See* Pl.'s Statement of Facts ¶ 34; Ex. P–85. Making clear that by his "entire" archive Hoffmann Jr. was not merely referring to the Nürnberg archive, the same letter also states that "[o]ne part of the entire archive, the part that happened to be in the American zone of occupation, was removed to Nuremberg" and that "this part of the former entire archive is all that I have left after the war." Ex. P–85. The court concludes that plaintiffs' conversion claims for the photographic archives taken by the Army and not covered by the vesting order accrued on May 20, 1949. Because plaintiffs have alleged elsewhere that the Time–Life portions of the archives were not part of the archives taken and transported by the Army, however, the Time–Life archives are excluded from this

---

**3.** Plaintiffs contend that the Fifth Circuit's finding in *Price* was erroneous to the extent that the Fifth Circuit relied on the deponent's testimony that the watercolors were "confiscated" in Munich prior to their transfer to Wiesbaden and shipment to the United States. In support of this contention, plaintiffs have submitted new testimony to the effect that the word used by the German witness, "beschlagnahme," does not mean "confiscate" in the sense of state action to deprive of ownership, but rather should be translated "taken into possession." *See* Pl.'s Statement of Facts ¶ 72; Ex. P–402, ¶¶ 4–11. The court fails to see how even this translation disturbs the conclusion that the watercolors were never returned to the Hoffmanns, and were thereby afforded "divergent treatment" from that given contemporaneously to the artwork that was returned to Hoffmann Jr.

determination. *See* Pl.'s Statement of Facts ¶¶ 48–51.

Plaintiffs also note that this "suit was filed within two weeks after the last rejection of the [1996] claim." Pl.'s Br. Supp.Summ.J. at 138. That an action seeking judicial review of a time-barred claim was filed promptly after an agency denial, however, does not suffice to resurrect the claim. The provisions of § 2401(b) are read conjunctively, as jurisdictional requirements, not disjunctively, as independent bases for jurisdiction. *Schuler v. United States*, 628 F.2d 199, 201 (D.C.Cir.1980) (en banc) ("Though the section is not happily drafted, common sense and the legislative history tell us that it requires the claimant both to file the claim with the agency within two years after accrual of the claim and then to file a complaint in the District Court within six months after the agency denies the claim."). Because there is no genuine issue of material fact as to when the claim for conversion of the archives not covered by the vesting order (other than the Time–Life archives) accrued, the court will grant summary judgment for defendants on the tort claims as to those archives.

### 3. The Time–Life Archives

Plaintiffs contend that Time–Life stole part of the Berlin portion of the Hoffmann Photographic Archives during the war and donated some or all of the stolen archives to the U.S. Army in 1981 and 1983, and that Hoffmann Jr. first learned of the existence of the stolen archives in early 1983. In support of these allegations, plaintiffs offer letters from employees of Time–Life Books and the United States Army Military History Institute indicating that in 1981 and 1983, the Institute accepted donations of some 7,000 "Heinrich Hoffmann prints" that had been "confiscated from Hoffmann's Berlin studio in May, 1945 by a LIFE magazine photographer." Ex. P–163, P–164, P–165, P–182A, P–183. Plaintiffs have also filed an affidavit from Hoffmann Jr. that he met Price in early 1983,

learned of the stolen archives from Price, and verified that the archives stored at the institute were part of his father's Berlin archives. Ex. P–244 at ¶¶ 19, 20. Finally, plaintiffs have submitted a written FTCA claim filed by Price and Hoffmann Jr. with the Houston office of the Department of Justice Civil Division on May 10, 1984. Ex. P–208; Consolidated Complaint ¶ 87.

Defendants do not contest these facts or contend that plaintiffs' claims regarding the Time–Life Archives are barred by the statute of limitations. Defendants correctly note, however, that each and every claimant is required to file an administrative claim in order to pursue a tort claim under the FTCA. *See Pipkin v. United States Postal Service*, 951 F.2d 272, 273 (10th Cir.1991) (barring wife's claim for failure to exhaust administrative remedies, even though husband had filed an administrative claim). Plaintiffs have therefore conceded that the Estate of Henriette Hoffmann von Schirach may not recover for the Time–Life Archives in this action. Pl.'s Br.Supp.Mot.Summ.J. at 178.

Defendants also contend that plaintiffs' claims for the Time–Life archive should be dismissed because they have already been the subject of the settlement of a civil action by plaintiffs against Time, Inc. Pl.'s Resp. to Def.'s Req. for Admission 22(a). Defendants assert that plaintiffs "have refused to disclose either the facts underlying their claim, or the terms of the settlement." Def.'s Mem.Supp. Renewed Mot.Summ.J. at 12 n. 6. Plaintiffs have not responded to this assertion. Because "a final judgment, whether arrived at by way of a settlement agreement or an adjudication on the merits, does extinguish a party's claim to remedies pertaining to 'all or any part of the transaction, or series of connected transactions, out of which the action arose,'" *Hydrocarbon Trading & Transport Co., Inc. v. Dep't of Energy*, 1995 WL 317424, at *5 (D.D.C.1995) (quoting Restatement (Second) of Judgments § 24 (1982)), defendants are entitled to know the facts underlying plaintiffs' claim

for the Time–Life archives and the terms of the settlement with Time, Inc..

### 4. The Vested Archives

Plaintiffs allege that "Government employees and others unknown conspired prior to the issuance of the void vesting order to convert the Hoffmann Photographic Archives and thus committed the tort of conspiracy," Pl.'s Br.Supp.Summ.J. at 107, and then fraudulently concealed this conspiracy. Consolidated Complaint ¶ 123. According to plaintiffs, the substantive offense underlying this conspiracy was the alleged breach of the Army's fiduciary duties to return the Hoffmann Photographic Archives and to pay for Hoffmann's loss of use. *Id.* at 108. Because plaintiffs have failed to offer evidence that would permit the review of the validity of the vesting order or support the finding of such fiduciary duties, summary judgment will be granted against the conspiracy claims and, a fortiori, the fraudulent conspiracy claims.

### IV. Conclusion

For the foregoing reasons, it is this 28th day of June, 1999, hereby

**ORDERED** that defendants' motion for summary judgment is **GRANTED** as to counts 3, 4, 9, 10, 11, 12, 14, 16 and 18 of the Consolidated Complaint; and it is further

**ORDERED** that defendants' motion for summary judgment is **DENIED** as to counts 13 and 15 of the Consolidated Complaint; and it is further

**ORDERED** that the clerk shall schedule a status hearing to address the procedure to be followed to determine whether the settlement of the plaintiffs' litigation against Time–Life, Inc. precludes plaintiffs' claims regarding the Time–Life Archives.