Robert H. HOFFMANN, Susanne Hustadt, Klaus Von Schirach, Heidemarie Kruger, Henriette Hoffmann Von Schirach, and Billy Price, Plaintiffs–Appellants,

v.

UNITED STATES and John D. Ashcroft, Attorney General of the United States, Defendants–Appellees.

No. 00–1131.

United States Court of Appeals, Federal Circuit.

Aug. 16, 2001.

Appellants' Petition for Rehearing Denied Nov. 6, 2001.

Before MICHEL, SCHALL, and DYK, Circuit Judges.

## DECISION

SCHALL, Circuit Judge.

Robert Hoffmann, Susanne Hustadt, Klaus von Schirach, Heidemarie Kruger, and Henriette Hoffmann von Schirach (collectively, "Plaintiffs") appeal the decision of the United States District Court for the District of Columbia denying their claim with respect to certain property recovered by the United States Army at the end of World War II. *Hoffmann v. United States,* 53 F.Supp.2d 483 (D.D.C.1999). Billy F. Price appeals his dismissal as a plaintiff. The case grows out of Plaintiffs' efforts to obtain the return of, or compensation for, a photographic archive and paintings formerly belonging to Heinrich Hoffmann Sr. ("Hoffmann Sr."). Specifically, the property at issue before the district court consisted of (1) four watercolors painted by Adolph Hitler; (2) a photographic archive compiled by Hoffmann Sr. and his son, Heinrich Hoffmann Jr. ("Hoffmann Jr."), part of which the Attorney General of the United States vested in 1951 pursuant to the Trading with the Enemy Act, 50 U.S.C.App. § 1 *et seq* ("TWEA"), and part of which remains non-vested but, at least allegedly, in the possession of the United States; and (3) the "Time–Life archive," a photographic archive given to the United States in the early 1980s by Time–Life, Inc.

Hoffmann Sr. and Hoffmann Jr. are both deceased. Plaintiffs are the heirs of Hoffmann Sr.'s children, Hoffmann, Jr. (Robert Hoffmann, Heidemarie Kruger, and Susanne Hustadt) and Henriette Hoffmann von Schirach (Klaus von Schirach,

Executor of her estate). Price, an art investor and author of a Hitler biography, became involved in the case in 1982 when he learned that Hoffmann Sr. had been the owner of the watercolors. Price paid a nominal sum to the Hoffmann heirs in exchange for their rights in the watercolors and archives, promising to seek return of the property and to give Plaintiffs a portion of whatever compensation he might receive from the United States government.

The instant case was consolidated in the United States District Court for the Southern District of Texas on October 2, 1997, from two actions brought by Price and Plaintiffs in that court, in 1989 and 1997. The Texas district court held that the conveyance of an interest in the property to Price was an improper assignment of a claim of interest against the United States in violation of the Anti–Assignment Act, 31 U.S.C. § 3727 (1994). Accordingly, on March 24, 1998, Price was dismissed as a plaintiff, and the case was transferred to the District of Columbia.

The District of Columbia district court granted summary judgment in favor of the government after rejecting Plaintiffs' claims based on the theories of implied-in-fact contract (bailment), Fifth Amendment takings, and tortious conversion. On appeal, Plaintiffs challenge the order transferring the case to the District of Columbia (the "transfer order") and the rulings of the district court on their claims. Price challenges the transfer order and his dismissal from the case. We decline to consider the issue of the transfer order, and with it Price's dismissal from the case, because the issue of the transfer order was not raised in the district court. As far as the merits of the case are concerned, we *affirm* the district court's grant of sum-

mary judgment insofar as it relates to the watercolors. We also *affirm* the district court's grant of summary judgment with respect to the vested portion of the archive. Finally, we *vacate* the grant of summary judgment insofar as it relates to the non-vested portion of the archive and *remand*. We do so in order that the district court may determine in the first instance whether Plaintiffs' claim relating to the non-vested portion of the archive is barred by the applicable statute of limitations. In the event that the court determines that the claim relating to the non-vested portion of the archive is not barred by the statute of limitations, it will be necessary for it to consider factual issues relating to Plaintiffs' contention that an implied-in-fact contract arose relating to that property.[1]

## DISCUSSION

### I.

In May of 1945, the United States Army seized the portion of the Hoffmann archive that was stored in Winhoring, Germany and sent parts of what was seized to Nuremberg for use by the War Crimes Commission. On May 31, 1951, the Assistant Attorney General and Director of Alien Property executed an order vesting all right, title, interest and claim in the Nuremberg portion of the archive in the Attorney General of the United States. Plaintiffs contend that the United States Army possesses the rest of the Winhoring archive, as well as photographs seized at other locations in Germany. These are the photographs that comprise the non-vested portion of the Hoffmann archive. In addition to the photographs, the United States Army also seized the four Hitler waterco-

---

1. Plaintiffs do not challenge the rulings of the district court with respect to the Time–Life archive.

lors. The Army transferred the watercolors to a central collecting facility in Munich, and subsequently shipped them to the United States.

## II.

Together with Price, Plaintiffs brought suit in the United States District Court for the Southern District of Texas in 1983 for the return of the watercolors and the photographs that the United States Army had seized. Alternatively, Price and Plaintiffs sought money damages for the tortious conversion of the property. Eventually, in 1989, the district court entered partial summary judgment on the issue of liability in Price's and Plaintiffs' favor, on the ground that the United States had wrongfully converted the property by refusing to return it. *Price v. United States,* ("*Price I*"), 707 F.Supp. 1465 (S.D.Tex.1989). Subsequently, the court awarded Price and Plaintiffs nearly $8 million in damages. On appeal, the United States Court of Appeals for the Fifth Circuit reversed the judgment of the district court and remanded the case for entry of judgment of dismissal with prejudice as to the claims for the watercolors and photographs, other than the Time–Life archive. *Price v. United States,* ("*Price II*"), 69 F.3d 46, 54 (5th Cir.1995). Regarding the watercolors, the court ruled that evidence in the record indicated that a tortious conversion of the paintings occurred in Germany, when the paintings were seized and shipped to the United States, not upon the United States' refusal to return the property to the Hoffmann family. *Id.* at 52. Regarding the photographs, the court ruled that the vesting order placed Plaintiffs' claim outside the United States' waiver of sovereign immunity. *Id.* Additionally, the court held, any challenge to the vesting order itself was barred by the statute of limitations pursuant to 50 U.S.C. App § 33 (1988). *Id.* at 53. The Fifth Circuit dismissed the claim relating to the

Time–Life archive without prejudice, because Price had failed to exhaust his administrative remedies under the Federal Torts Claim Act ("FTCA"), 28 U.S.C. § 2401(b) (1988). *Id.* On petition for rehearing, the Fifth Circuit concluded that the vesting order did not cover all of the photographs allegedly seized by the United States Army. *Price v. United States,* ("*Price III*"), 81 F.3d 520 (5th Cir.1996). Therefore, the court dismissed the portion of the claim relating to the photographs not subject to the vesting order. The court stated that the dismissal was without prejudice to "a separate lawsuit pending in the district court." *Id.* That "separate lawsuit" was the 1989 action in the Southern District of Texas, which subsequently was consolidated with the 1997 action in the same court.

## III.

As noted above, what was before the district court in the District of Columbia was a consolidated complaint that originally was filed in the Southern District of Texas. With respect to the bailment claims, the District of Columbia court concluded that Plaintiffs had failed to raise a genuine issue of material fact as to whether an implied-in-fact contract of bailment was created with respect to any of the property, because they could not show that the United States had taken the watercolors or any of the photographs, whether or not covered by the vesting order, with the intention of returning them. *Id.* at 489–90. Similarly, with respect to the Fifth Amendment claims, the court determined that Plaintiffs had failed to establish the necessary voluntary or contractual relationship with the United States to avail themselves of the Fifth Amendment as non-residents. *Id.* at 491. As far as Plaintiffs' FTCA claims were concerned, the district court ruled that res judicata barred review of the Fifth Circuit's dis-

missal of the claim for the watercolors. *Id.* at 493. With respect to the non-vested portion of the archive, the court concluded that the conversion claims accrued on May 20, 1949, when Hoffmann was informed of the fact that the United States forwarded his entire archive to Washington. *Id.* Therefore, the court held, Plaintiffs' claims, to the extent that they were grounded in tort, were barred by the statute of limitations. *Id.*

The district court granted summary judgment in favor of the government on all claims except the Time–Life archive. *Id.* at 495. As noted above, subsequent to the decision, Plaintiffs relinquished their claims against the government with respect to the Time–Life archive.

### IV.

We have jurisdiction to review the decision of a district court that is based in whole or in part on 28 U.S.C. § 1346(a)(2) (1994), the Little Tucker Act. 28 U.S.C. § 1295(a)(2) (1994). The Little Tucker Act grants concurrent jurisdiction in the Court of Federal Claims and the United States district courts for any "civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2) (1994). In their consolidated complaint, Plaintiffs claim $9000 in contract damages for the four watercolors, as well as $9000 for the non-vested portion of the archive.

█ The instant appeal also includes claims based not only on the Little Tucker Act, but also on the FTCA. While we ordinarily do not have appellate jurisdiction over FTCA claims, see 28 U.S.C. § 1295(a)(2), "a mixed case, presenting both a nontax Little Tucker Act claim and an FTCA claim, may be appealed only to

the Federal Circuit." *United States v. Hohri,* 482 U.S. 64, 75–76, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987); *see also Gollehon Farming v. United States,* 207 F.3d 1373, 1378 (Fed.Cir.2000). Thus, because the district court had jurisdiction over this case based in part on the Little Tucker Act, we retain exclusive appellate jurisdiction over all the claims present in the case.

### V.

█ As noted above, the United States District Court for the Southern District of Texas ordered the case based upon the consolidated complaint transferred to the District of Columbia after it dismissed Price from the case. In arguing that the case should not have been transferred, Plaintiffs and Price contend that the court erred in the underlying ruling, the dismissal of Price from the case. We decline to consider Plaintiffs' challenge to the order that transferred the case from the Texas district court to the District of Columbia. Once a motion to transfer has been granted and the action has been transferred, the losing party must make a motion to retransfer the case in the transferee district court in order to preserve the issue for appeal. 17 James Wm. Moore et al., Moore's Federal Practice, ¶ 111.64[2][b] (3d ed.1999). If no motion is made, neither the transferee circuit nor the transferor circuit has jurisdiction to review the transfer order. *Id; Hill v. Henderson,* 195 F.3d 671, 677 (D.C.Cir.1999) (noting that the term "jurisdiction" as applied to a court's ability to review a transfer order, refers to venue rather than subject matter jurisdiction). In this case, it is undisputed that Plaintiffs made no motion to retransfer the case back to the Texas district court. Since parties may normally consent to be sued in a court that would otherwise be an improper venue, Plaintiffs' failure to object waives the issue. *See* Fed.R.Civ.P. 12(h)(1); *Hill,* 195 F.3d at 677 n. 2 (citing

*Texas Mun. Power Agency v. EPA,* 89 F.3d 858, 867 (D.C.Cir.1996)). Accordingly, we will not review the transfer order or the underlying ruling dismissing Price from the case based upon a violation of the Anti–Assignment Act.

## VI.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Ysasi v. Rivkind,* 856 F.2d 1520, 1524 (Fed.Cir.1988). We review a grant of summary judgment without deference. *Ysasi,* 856 F.2d at 1524. In addition, we must, as the district court was required to do, draw all reasonable factual inferences in favor of the nonmovant. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

■■■ Plaintiffs challenge all aspects of the district court's ruling, including the conclusion that Plaintiffs, as non-resident aliens, cannot assert a Fifth Amendment claim for any of the disputed properties. Plaintiffs argue that the Fifth Amendment does not distinguish between aliens and citizens, and note that the Supreme Court has held that Fifth Amendment protection can extend to a non-enemy alien. *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 489, 51 S.Ct. 229, 75 L.Ed. 473 (1931). However, constitutional protections extend to aliens only "when they have come within the territory of the United States and developed substantial connections with this country." *United States v. Verdugo–Urquidez,* 494 U.S. 259, 270, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). Because Plaintiffs have failed to establish 'substantial connections' to the United States, we affirm the district court's decision with respect to Plaintiffs' Fifth Amendment claims. We

therefore turn to Plaintiffs' contract and tort claims with respect to each of the remaining items of property at issue.

## A. *Watercolors*

■■■ Plaintiffs allege that an implied-in-fact contract of bailment was created when the United States Army seized the four paintings. "Tucker Act jurisdiction extends only to contracts either express or implied-in-fact, and not to claims on contracts implied in law." *Hercules Inc. v. United States,* 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1324–25 (Fed.Cir.1997). Plaintiffs allege that an implied-in-fact bailment contract was created when the United States Army seized the four paintings from Hoffmann's home and removed them to the Munich Central Collection Point in 1946. Whether a contract exists is a mixed question of law and fact. *Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998). To prove that an implied-in-fact bailment contract exists, a claimant must show a "mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the government in contract." *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984). For the United States to be bound by an implied-in-fact contract of bailment, there must be "a promise, representation or statement by any authorized government official" that the property would be returned. *Ysasi,* 856 F.2d at 1525. Plaintiffs contend that the Army's conduct with respect to the watercolors demonstrates the existence of a bailment. Plaintiffs presented testimony that the Munich Central Collection Point, where the paintings were held before being shipped to the United States, was established for the purpose of identifying seized objects for return to their owners. *Id.* at 490. The Army's transfer of the

paintings to the collection center, Plaintiffs argue, demonstrates that the United States intended to return the paintings to their original owners.

While the decision of the Fifth circuit is not collateral estoppel on this issue, we agree with the Fifth Circuit that the evidence "will not support a conclusion that the *watercolors* were held in bailment." *Price II*, 69 F.3d at 52 (emphasis in the original). The district court correctly held that evidence as to the general purpose of the Munich Central Collection Point is insufficient to support the specific inference that the Army brought the paintings to the collection center with the intention of returning them to the Hoffmann family. Plaintiffs fail to allege that an official with authority actually bound the United States to return the paintings. Significantly, the Army returned other artwork belonging to Hoffmann Sr. about the same time the watercolors were confiscated, but continued to retain possession of the watercolors painted by Hitler. *Hoffmann* 53 F.Supp.2d at 492 (citing *Price II*, 69 F.3d at 51). The divergent conduct indicates, if anything, an intent not to return the watercolors, as the Army could have returned the paintings as it did the rest of Hoffmann Sr.'s art collection. We therefore affirm the district court's grant of summary judgment as it relates to the watercolors.

### B. *Vested Portion of the Archive*

■ Plaintiffs challenge the district court's ruling that they failed to present sufficient evidence to show that a genuine issue of material fact existed as to whether a bailment contract was created when the United States took a portion of the Hoffmann family photographs for use at Nuremberg. A bailment was created in May of 1945, Plaintiffs argue, from the conversations between Hoffmann Jr. and certain Army personnel at Nuremberg. In the district court, the government argued that no implied-in-fact contract was created with respect to the vested archive and that, in any event, any claim based upon such a contract was barred by the applicable statute of limitations. The district court did not address the government's statute of limitations argument. Instead, it granted summary judgment based upon the merits. Even assuming that such a contract was created, we conclude that any claim for it is time-barred.

■ The Little Tucker Act sets up a jurisdictional scheme for certain claims against the United States. *Broughton Lumber Co. v. Yeutter*, 939 F.2d 1547, 1556 (Fed.Cir.1991). The six-year statute of limitations of the Little Tucker Act, 28 U.S.C. § 2401(a) (1994), is a limitation on the district court's jurisdiction. *Bray v. United States*, 785 F.2d 989, 992 (Fed.Cir. 1986). Because jurisdictional determinations are questions of law, we review de novo a court's decision to dismiss a claim as barred by a statute of limitations. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998) (discussing 28 U.S.C. § 2501, the analogous statute of limitations for suits against the government brought in the Court of Federal Claims, *see Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 n. 3 (Fed.Cir.1988)).

■ A claim first accrues for purposes of 28 U.S.C. § 2401(a), (and its analogous 28 U.S.C. § 2501), "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Alder Terrace*, 161 F.3d at 1377 (quoting *Kinsey v. United States*, 852 F.2d 556, 557 (Fed.Cir.1988)); *see also Hopland*, 855 F.2d at 1577 (stating that a claim accrues only when "all the

events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence"). Generally, in the case of a breach of a contract, a cause of action accrues when the breach occurs. *Alder Terrace,* 161 F.3d at 1377. A breach of contact is a failure to perform a contractual duty when it is due. *Trauma Serv. Group,* 104 F.3d at 1325. In the case of a bailment contract, the breach, or failure to perform, occurs when the bailee refuses to return the property at the request of the owner. *See Ysasi,* 856 F.2d at 1525.

Any bailment contract that might have been created with respect to the vested portion of the archive plainly was breached in 1951 by the vesting order. Plaintiffs attempt to avoid this problem, however, by challenging the validity of the vesting order under the TWEA. The TWEA provides that "[a]ny person not an enemy or ally of an enemy claiming any interest, right or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him ... may file with the said custodian a notice of his claim" for the President to determine entitlement. 50 U.S.C.App. § 9(a) (1994). However, under the TWEA, any claim that is instituted "after the expiration of two years from the date of the seizure by or vesting in the Alien Property Custodian, as the case may be, of the property or interest in respect of which relief is sought" is barred. 50 U.S.C.App. § 33 (1994). The district court held that Plaintiffs TWEA claims were barred by this statute of limitations, because the vesting order was dated May 31, 1951.

The Fifth Circuit decided that Plaintiffs' challenge to the validity of the vesting order under the TWEA was barred by the statute of limitations because the vesting order was dated May 31, 1951. Because Plaintiffs had a full and fair opportunity to litigate this exact issue in the first action in Texas, and because the Fifth Circuit's ruling on this issue was necessary to the judgment in that action, Plaintiffs are precluded from relitigating their challenge to the vesting order in this action. *See Innovad Inc. v. Microsoft Corp.,* 2001 WL 877583, *6 (Fed.Cir.2001) (citing *In re Freeman,* 30 F.3d 1459, 1465, 31 USPQ2d 1444, 1448 (Fed.Cir.1994)). We therefore affirm the district court's grant of summary judgment with respect to the vested portion of the archive. We do so on the ground that the claim is time-barred.

## C. *Non–Vested Portion of the Archive*

Finally, we turn to Plaintiffs' claims that an implied-in-fact contract of bailment was created with respect to the non-vested portion of the archive. The district court did not address the government's statute of limitations argument with respect to the non-vested portion of the archive and granted summary judgment instead based upon the merits. As far as the merits are concerned, Plaintiffs did not present evidence specifically regarding the bailment of the non-vested portion of the archive, stating merely that the evidence presented regarding the vested portion of the archive applied to the entire archive. Plaintiffs contended that an implied-in-fact contract of bailment was created in May of 1945 when the United States Army seized the entire Hoffmann photographic collection from Germany.

Evidence in the record indicates that there is a possibility that both members of the United States Army as well as Hoffmann Jr. were under the impression that

the non-vested photographs were on loan to the United States. Specifically, Plaintiffs' presented a 1948 Opinion of Chief of the Historical Division in Washington stating that "technically, [Hoffmann's] files are probably his personal property." A March 14, 1949 memorandum of Major Raymond Hill to a Colonel Potter noted that Major Hill "had received authority from Berlin to transfer the entire Hoffmann photographic collection to the Historical Division. Captain Paul stated that he had previously been under the assump-. tion that the collection would revert to the ownership of Hoffmann upon completion of its use." Additionally, a 1949 letter from a Colonel Harris to Colonel Potter stated that it "seems likely" that the archive will be returned to its original owner.

In February of 1950, the Army requested that Hoffmann Jr. provide certain information "[i]n order to determine the exact legal status of the photographic file of which you are the alleged former owner." The Army expressed its concern in a January 24, 1950, letter to the Historical Division that it did not "acquire title" to the missing archive, raising the possibility that it "could be required to return it and fix compensation for its use when peace is made." Finally, in a 1951 memorandum, the Chief of the Historical Division in Europe stated "[i]f it can be proven that part of the Hoffmann photographic file does not fall within the classification of property the existence of which is prejudicial to the United States Government and any of its agencies, then our retention of such property, it is believed, cannot be justified legally." Evidence suggesting that the legal status of the non-vested portion of the archive was unresolved raises the possibility of "a promise, representation or statement by any ... authorized government

official," *Ysasi*, 856 F.2d at 1525, that the property was being held in bailment until its return.

In Hoffmann Jr.'s June 17, 1949 letter he wrote, "an American jurist also assured me, after a private inquiry, that there was a U.S. regulation in force that could not deprive me of my archive.... I held the opinion until 20 May 49 that my property would be returned to me." In a May 15, 1950 letter Hoffmann Jr. wrote that "I was assured by U.S. officials at Nuremberg that my photo archives were regarded by the U.S. Army as a loan for the duration of the trials." In the highly unusual circumstances of this case, evidence of Hoffmann's impressions from the United States officials demonstrates the possibility that an "authorized government official," *Ysasi*, 856 F.2d at 1525, represented that the United States Army would return the photographs to Hoffmann Jr. We therefore conclude that, based upon the material of record that has been presented to us, a genuine issue of material fact exists as to the existence of an implied-in-fact contract of bailment with respect to the non-vested portion of the archive.

At the same time, however, evidence in the record indicates that, at some time prior to March 14, 1949, authority was granted for the Army to transfer the "entire Hoffmann photographic collection," both vested and non-vested portions, to the United States. Hoffmann Jr.'s June 17, 1949 letter to the Army's Historical Division indicated that he was aware of the two parts of his archive—the portion used in Nuremberg and the rest—and protested the Army's possession of both portions: "On 20 May 49 I was informed by Major Murphy, Historical Division, Frankfurt/Main, that my entire photo archive had been forwarded to Washington and I

had no right to claim its return." After a series of letters exchanged between Hoffmann Jr. and the United States, the Army shipped the entire archive to the United States without returning any portion to the Hoffmann family. On January 29, 1951, Hoffmann Jr. again protested the Army's confiscation of the photographs. In March of 1956, an attorney hired by Hoffmann Jr. asserted a claim for the return of the photographs. The attorney was informed that the return of the property would have to occur through "diplomatic channels," and "[i]f Mr. Hoffmann desires to pursue this matter further, he may refer his claim to the German Foreign Office." This response to the letter from Hoffmann Jr.'s counsel indicates the denial of the existence of any contract of bailment with respect to the photographs, including the non-vested portion of the archive, which denial would be a breach of contract. Since the breach occurred more than six years before suit was filed, any claim based upon it relating to the non-vested portion of the archive would be time-barred.

While the foregoing suggests merit to the government's statute of limitations argument, we believe that, in the first instance, the issue should be addressed by the district court, particularly in view of the voluminous record in this case. The question to be addressed is, assuming that an implied-in-fact contract of bailment existed, at what point did the government fail to perform on the contract.

For the foregoing reasons, we *affirm* the district court's grant of summary judgment insofar as it relates to the watercolors and the vested portion of the archive. We *vacate* the grant of summary judgment insofar as it relates to the non-vested portion of the archive and *remand* the case for further proceedings consistent with this opinion.

Each party shall bear its own costs.